713 A.2d 509 (1998)
313 N.J. Super. 488
Larry CARROLL, on Behalf of Himself and all Others Similarly Situated, Plaintiff-Respondent,
v.
CELLCO PARTNERSHIP, Defendant-Appellant.
Christopher G. KUHN and Rosalind[1] Tyman, on Behalf of Themselves and on Behalf of all Others Similarly Situated, Plaintiffs-Respondents,
v.
CELLCO PARTNERSHIP, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1998.
Decided June 2, 1998.
*510 Myron D. Cohen (Hunton & Williams) of the New York Bar, admitted pro hac vice, New York City, for defendant-appellant (Tompkins, McGuire & Wachenfeld, Newark, and Mr. Cohen, attorneys; William B. McGuire, Eugene J. Sullivan and William H. Trousdale, Newark, and Christopher M. Mason, on the brief).
Donald P. Alexander (Greenfield & Rifkin) of the Pennsylvania Bar, admitted pro hac vice, Ardmore, PA, for plaintiffs-respondents (Sherman, Silverstein, Kohl, Rose & Podolsky, and Mr. Alexander, attorneys; Alan C. Milstein, Pennsauken, on the brief).
Gail Gottehrer (Lawrence E. Feldman & Associates, Jenkintown, PA) of the Pennsylvania Bar, admitted pro hac vice, Wyncote, PA, for plaintiffs-respondents.
Before Judges DREIER, KEEFE and WECKER.
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant Cellco Partnership appeals by leave granted from an interlocutory order granting plaintiffs' class certification. Plaintiff Larry Carroll and plaintiffs Christopher G. Kuhn and Rosalind Tyman filed two separate complaints against defendant. The actions were consolidated, and the court deemed Carroll's to be the operative complaint in which the other claims were subsumed. Plaintiffs moved for class certification, naming plaintiffs Carroll, Kuhn, and Tyman as class representatives. Defendant opposed the motion and itself unsuccessfully moved to stay discovery until resolution of the class issue. After a hearing based upon documents and oral arguments, the court granted the class certification in an order dated November 14, 1997. On defendant's motion, we granted leave to appeal.
After purchasing a cellular telephone in 1989, plaintiff Carroll subscribed to Bell Atlantic Mobile ("BAM") for cellular telephone services. Carroll questioned several charges after receiving the first monthly bills. Whenever he placed a call outside BAM's wireless telephone network, BAM charged a "landline" fee. Allegedly unbeknownst to Carroll, BAM also "rounded-up" calls in full minutes, a practice whereby customers were charged for calling time to the next full minute, and BAM measured the duration of each call from the time the "send" button was pressed until the last hang-up. In addition to these charges, Carroll opposed BAM's imposition of security pin codes which negated useful features of his telephone such as automatic redialing. But more frequently, Carroll complained about "dropped calls." As he moved around, Carroll often experienced an interruption of signals, thereby requiring him to redial and reconnect. Carroll called BAM at least once per billing period to receive credit for prematurely disconnected calls. Although BAM reimbursed Carroll for some of the dropped calls, he did not receive full credit.
Based upon these complaints, Carroll sued defendant, a Delaware partnership doing business as Bell Atlantic Mobile, formerly Bell Atlantic NYNEX Mobile, individually and on behalf of similarly situated customers. Carroll alleged three causes of action sounding in (1) unfair or deceptive practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.; (2) common law fraud; and (3) common law negligent misrepresentation.
Carroll asserted that at the time he and other members of the class purchased cellular telephone services from defendant, they were not informed of potential problems. Instead, Carroll claimed he was led through defendant's advertising, marketing and promotional materials to believe that defendant offered quality and uninterrupted services. Carroll also maintained that through its sales literature, defendant intentionally misrepresented facts relating to its cellular telephone services and hidden billing practices, making it appear that defendant's services were more economical than the services of its competitors.
*511 In addition to class certification, Carroll sought a declaration that defendant's conduct was unlawful, damages, punitive damages, an order enjoining defendant from engaging in similar unlawful practices in the future, injunctive relief providing improvements in the delivery of cellular services and the right to terminate services without penalties, and attorney fees.
Plaintiffs Kuhn and Tyman filed a nearly identical complaint. After receiving their first bills from Bell Atlantic NYNEX Mobile (BAN Mobile), Kuhn and Tyman discovered charges which they claim had not been disclosed to them when they signed up for cellular telephone services. Like Carroll, Kuhn and Tyman objected to the landline fees, "send to end" charges, BAN Mobile's practice of rounding-up fractions of calling time to the next full minute, and frequent "drop-offs." They claimed that in subscribing to BAN Mobile's cellular telephone services, they and other class members reasonably relied upon the misrepresentations and omissions of material facts by defendant.
In his deposition, Kuhn individually complained about BAN Mobile's promise of thirty free minutes of calling time per month. Based on promotional materials, Kuhn believed that he would receive thirty free minutes with his cellular phone service and that a feature on the telephone allowed customers to calculate how many free calling minutes remained. However, because BAN Mobile charged customers from the time they pressed the send button to the time the call disconnected, the thirty free minutes were severely reduced. At the time of his deposition, Kuhn did not have any individual claims related to pin codes or detection of cellular fraud for which he was seeking damages.
In opposing class certification, defendant argued there were no common questions of law or fact shared by the many putative plaintiffs, and that class certification prevented defendant from exploring the individual claims of such finite plaintiffs as may assert they were defrauded. Despite these claims, the court found that the proposed class of "all persons who purchased BAN Mobile and/or BAM cellular telephone service since February 1, 1990 other than defendant and members of the defendant's dealer network as well as its partners, their respective directors and officers, and members of the immediate families of those directors and officers," with the exception of a sub-class whose agreements adequately disclosed the practice of "rounding up," satisfied the requirements of R. 4:32-1. The court therefore granted certification, noting that adjustments to the class and sub-class may be required following discovery.
In its oral opinion, the court reasoned that class certification was warranted because the class was so numerous that joinder of all members was inappropriate and impractical. The court went on to hold that there were questions of law and fact common to the class, the claims of the representative parties were typical, and that the representative parties would fairly and adequately protect the interests of the class. Finally, the court stated that a class action would be "far superior to any individual actions by persons allegedly aggrieved by the defendant's conduct."

I.
Defendant first challenges the court's conclusion that the requirements of R. 4:32-1(b)(3) were satisfied. Defendant points to the lack of in-depth analysis explaining why questions of law or fact common to the class members predominated over questions affecting individual members. As an example of the trial judge's inadequate findings, defendant notes the court's conclusory statements that the existence of different choice of law provisions would not preclude class certification in New Jersey and that any conflicts in state laws could be addressed later. To bolster its claim, defendant stresses several issues of law and fact that the court overlooked, such as the varying clauses in the different customer contracts used in each region, the inclusion of arbitration requirements in many forms of cellular agreements, the selective application of landline fees in different regions, the individual sales conversations that led to the purchase of defendant's cellular telephone services, the varying advertising to which each of the millions of potential plaintiffs were exposed, the *512 imposition of tariffs in some states barring class members' claims as a matter of law, and finally, the differences in state laws on the issues of fraud and negligent misrepresentation.
The pivotal question here is the nature of the inquiry that a court must undertake in determining predominance. Rule 4:32-1 provides the answer. Rule 4:32-1 states:
(a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:
....
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.
First, to maintain a class action in New Jersey, the class representative must satisfy all four prerequisites of R. 4:32-1(a), numerosity, commonality, typicality and adequacy of representation. In the Matter of Cadillac V8-6-4 Class Action, 93 N.J. 412, 424-25, 461 A.2d 736 (1983). In addition, the class representative must demonstrate that it fulfills one of the three alternative requirements of R. 4:32-1(b). Id. at 425-26, 461 A.2d 736; Lusky v. Capasso Bros., 118 N.J.Super. 369, 372, 287 A.2d 736 (App.Div.), certif. denied, 60 N.J. 466, 291 A.2d 16 (1972). Where, as in this case, the trial court certified the class based on common questions of law or fact, there must be a finding that the "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3).
In determining predominance and superiority, R. 4:32-1(b)(3) dictates consideration of three factors: (1) "the interest of members of the class in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;" and (3) "the difficulties likely to be encountered in the management of a class action." See Amchem Prods., Inc. v. Windsor, ___ U.S.___, ___, 117 S.Ct. 2231, 2246, 138 L.Ed.2d 689, 708 (1997) (stressing the need to examine similar nonexhaustive factors under Fed. R.Civ.P. 23(b)(3) before granting class certification).
The Supreme Court has held that a class action may be certified only if the trial court has undertaken a "rigorous analysis" and is satisfied that the prerequisites of Rule 23(a), the federal equivalent of R. 4:32-1, have been met. General Telephone Co. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740, 752 (1982). Although class certification should not be denied based on the merits of a complaint, some preliminary analysis is required. In re Cadillac, supra, 93 N.J. at 426, 461 A.2d 736; Olive v. Graceland Sales Corp., 61 N.J. 182, 189, 293 A.2d 658 (1972). As stated by the Fifth Circuit, inquiry beyond the pleadings is necessary because "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996).
*513 In Castano, the court held that, in a nationwide class action, a predominance inquiry that did not include a discussion of how variations in state law would affect predominance and superiority constituted reversible error. Id. at 740. The court also recognized as error the district court's failure to explain how a trial on the merits would be conducted. Ibid. The court reached this decision because it determined that in multistate class actions, variations in state law may overwhelm common issues and preclude a finding of predominance. Id. at 741. An examination of a jury interrogatory and verdict form; a survey of medical monitoring decisions, consumer fraud actions and punitive damage laws in the defendants' home states; and reliance on two district court opinions provided an insufficient basis to certify a class of plaintiffs alleging injuries from nicotine addiction. Id. at 742-43. What was missing was a discussion of how the court would deal with variations in state law and how these variations would affect predominance. Id. at 743.
The trial judge's stated analysis of state law issues in this case falls short of the Castano standards. In discussing the manageability of the class action, the court merely noted the possibility of multiple state law issues. Instead of examining the different state laws and resolving whether any conflicts in laws might lead to individual questions of law, the trial judge simply stated that "it would seem that there could not be a substantial difference in any event but wherever there is, it could be dealt with." This conclusory statement does not reflect a "rigorous analysis." See Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C.Cir.1986), cert. denied, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987) (requiring a "considered predomination determination" in nationwide class actions where state law variations are involved); In re School Asbestos Litigation, 789 F.2d 996, 1010 (3d Cir.), cert. denied, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) (observing the need for multistate class plaintiffs to undertake an extensive analysis of state law variances among jurisdictions to demonstrate that "class certification does not present insuperable obstacles"). See also In re Hotel Telephone Charges, 500 F.2d 90 (9th Cir.1974) (finding that the district court simply brushed aside a discussion of predominance by stating that individual questions "lie[s] far beyond the horizon in the realm of speculation").
In addition, the court did not mention whether any individual class member expressed an interest in controlling the litigation, or whether there was any pending litigation that might have already been commenced by or against the members of the class. See R. 4:32-1(b)(3). Absent such an analysis, the court's determination that questions of law or fact common to class members predominated over individual questions is not valid.
This court has determined that conflict of law issues do not per se foreclose certification of a multistate class. Delgozzo v. Kenny, 266 N.J.Super. 169, 190, 628 A.2d 1080 (App.Div.1993). However,this does not imply that an analysis of the different state laws and the effect on the predominance of common legal issues is not necessary. A thorough analysis of state laws is particularly important in circumstances where, as in this case, there is a possibility that common issues could be subsumed by substantive conflicts in state laws. Defendant used several different contracts in signing up millions of customers in at least nineteen jurisdictions over a six-year period. There were at least five different contracts, each with a different choice of law provision. Of course, depending on variations in state laws, the members of the class in different states may be grouped into subclasses. See id. at 188, 628 A.2d 1080. But there may be differences in how each state defines common law fraud, negligent misrepresentation, or consumer fraud, thus making a trial judge's task of instructing a jury on relevant law impossible. See In re American Med. Sys., Inc., 75 F.3d 1069, 1085 (6th Cir.1996) (noting that a court's failure to consider how the laws of negligence differ from one jurisdiction to another is grounds for decertification); In the Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-02 (7th Cir.), cert. denied sub. nom., Grady v. Rhone-Poulenc Rorer, Inc., 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995) (difference in definition of *514 common law negligence among states precluded nationwide class certification of individuals who had contracted the HIV-virus from defendant's products).
Because of the trial court's too brief analysis, we are left to speculate how a court might handle variations in state laws and whether individual questions of law might predominate over common questions. Consequently, we are constrained on this basis alone to reverse and remand for further proceedings.

II.
Defendant next contends that any court performing a predominance inquiry for each claim would conclude that common questions of law or fact do not predominate over individual questions. Defendant argues that within each cause of action material differences necessarily abound. It further contends not only that the elements of common law fraud, negligent misrepresentation and Consumer Fraud Act violations are different among the relevant jurisdictions, but also that the factual differences among each class member create insurmountable problems in proving the essential elements of each claim in a class action context.
In New Jersey, class actions are liberally construed, and such an action is "permitted unless there is a clear showing that it is inappropriate or improper." Lusky v. Capasso Bros., supra, 118 N.J.Super. at 373, 287 A.2d 736. See Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 225, 294 A.2d 7 (1972) (noting that class certifications should be granted unless "clearly infeasible"); Delgozzo v. Kenny, supra, 266 N.J.Super. at 179, 628 A.2d 1080; Gallano v. Running, 139 N.J.Super. 239, 244, 353 A.2d 158 (Law Div. 1976), certif. denied, 75 N.J. 600, 384 A.2d 830 (1978). This preference for class certification applies especially for adjudication of multiple consumer-fraud claims. Strawn v. Canuso, 140 N.J. 43, 68, 657 A.2d 420 (1995) ("[A] class action is the superior method for adjudication of consumer-fraud claims...."); Riley, supra, 61 N.J. at 228, 294 A.2d 7 (cautioning courts from withholding class certification in consumer-fraud cases where a plaintiff may be unable to demonstrate all the requisites and prove that the suit is manageable). The purpose of class certification under this rule is to "save time and money for the parties and the public and to promote consistent decisions for people with similar claims." In re Cadillac, supra, 93 N.J. at 430, 461 A.2d 736.
In a predominance inquiry, the focus is on whether the proposed classes are "sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, supra, ___ U.S. at___, 117 S.Ct. at 2249, 138 L.Ed.2d at 712. Predominance is not, however, determined by adding up the number of common and individual issues and determining which is greater. Deutschman v. Beneficial Corp., 132 F.R.D. 359, 375 (D.Del.1990). The critical consideration is whether there is a "`common nucleus of operative facts.'" In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736 (citation omitted). Although all issues need not be identical among all class members, common questions must predominate. Saldana v. City of Camden, 252 N.J.Super. 188, 197, 599 A.2d 582 (App.Div.1991). To demonstrate that common law issues predominate over individual issues in consumer-fraud cases, plaintiffs must be able to prove individual reliance. 5 James W. Moore et al., Moore's Federal Practice § 23.47(2) (3d ed.1997).
In Delgozzo v. Kenny, we stated that New Jersey courts permit class certification even though individual questions, such as the degree of damages due a particular class member or the reliance by individual members on alleged misrepresentations persist after resolution of common questions. 266 N.J.Super. at 181, 185, 628 A.2d 1080. Thus, even though there were individual questions of causation remaining (which cases have called "remainder" claims), failure of defendants to cure the defect, reliance on defendants' alleged misrepresentations, and damages, in Delgozzo we granted class certification because plaintiffs shared similar grievances with respect to their heating units. Id. at 189-90, 628 A.2d 1080. They also sought to show the existence of a design defect common to all burners, the existence of implied warranties, failure of defendants to warn all plaintiffs of the product's hazards and to *515 perform adequate tests on the product, common misrepresentations in advertising, and defendants' common unconscionable commercial practices. Ibid.
Remainder individual issues, however, are distinguishable from individual questions that eclipse common questions. After the Delgozzo decision, the Law Division in Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J.Super. 336, 696 A.2d 793 (Law Div.1997) held that certification of a nationwide class of persons who sustained losses as a result of purchasing Pepcid AC was not warranted based on the overwhelming individual questions that predominated over any common questions. Id. at 349-50, 696 A.2d 793. The plaintiffs brought the class action, alleging violations of the Consumer Fraud Act, common law fraud and negligent misrepresentation, on the grounds that defendant had promoted inaccurate and misleading advertisements for its product. Id. at 340, 696 A.2d 793. The court agreed with the plaintiffs' contention that all of the prerequisites for class certification set forth in R. 4:32-1(a) were satisfied. Id. at 341, 696 A.2d 793. However, the court reviewed the elements of each count that plaintiffs were required to prove, along with the ambiguous depositions given by the representative class members (no class representative could recall seeing a particular advertisement or its specific content) and determined that the proposed class would face insurmountable difficulties in trying to prove the elements of reliance, ascertainable loss or injury resulting from defendant's advertising. Id. at 344-46, 696 A.2d 793. The judge reasoned that because only persons who saw the challenged advertisements and relied on them in purchasing the drug belonged in the class, individual questions predominated over questions in common. Id. at 349-50, 696 A.2d 793.
Essentially, the court in Gross stated that to prove reliance on the challenged advertisements, every class member would be required to answer questions whether he or she relied on at least one of the three advertisements when deciding to purchase Pepcid, and whether they would not have purchased the drug but for the particular advertisement. Ibid. The defendant's right to cross-examine each plaintiff could not be protected in such a class action. Thus, because the question of each plaintiff's reliance on the particular challenged advertisements during a nationwide media blitz proved to be highly individualized and complex, class certification was denied. Ibid.
Gross is not unique. See In re American Med. Sys., supra, 75 F.3d at 1085 (no predominance of common issues in class action brought by users of penile prostheses because each product was different, each plaintiff had a unique complaint and information given by physicians varied); In re Hotel Telephone Charges, supra, 500 F.2d at 89 (citing the Advisory Committee's Note wherein the Committee stated that "a class action treatment may be unsuitable in a fraud case if there are material variations in the representations made or in the kinds or degrees of reliance by the plaintiffs"); Edelman v. Lee Optical Co., 24 Ill.App.3d 216, 320 N.E.2d 517, 519 (1974) (noting that a class action cannot be maintained where the claims of individual class members are based on separate and distinct questions of fact); Saldana v. City of Camden, supra, 252 N.J.Super. at 197-98, 599 A.2d 582 (stating that commonality of issues becomes obscured when unique issues of liability, causation and damages require individualized treatment at trial).
In their complaint, plaintiffs claim the following common issues of law or fact: (1) the misrepresentation or omission of facts regarding the cost of subscribing to the cellular telephone services sold to plaintiffs and the performance of cellular telephone services; (2) the materiality of the misrepresentations regarding the prices and performance of the cellular telephone services; (3) reliance of plaintiffs and other class members upon those misrepresentations to their detriment; (4) breach of the terms and conditions of defendant's service agreements with plaintiffs by failing to provide an appropriate level of service consistent with customer expectations and failing to detect and prevent cellular fraud; and (5) the extent of damages to customers. A closer examination of the plaintiffs' depositions, however, reveals that the ability of each plaintiff to prove fraud and *516 negligent misrepresentation, and possibly violations of the Consumer Fraud Act, is dependent on an individual examination of each contract, the varying representations made by defendant's representatives to customers to encourage them to subscribe, reliance upon these representations, as well as the amount of damages that each plaintiff could allege.
Plaintiffs first allege common law fraud. To prevail on this claim, plaintiffs must prove: (1) a material representation of a past or present fact; (2) knowledge by the defendant of its falsity; (3) intention that it be relied upon; (4) reasonable reliance by the other person; and (5) resulting damages. Gross, supra, 303 N.J.Super. at 344, 696 A.2d 793. In the second count, plaintiffs allege negligent misrepresentation which requires proof that an "incorrect statement was negligently made and justifiably relied upon" and that injury was sustained as a consequence of that reliance. Ibid. Finally, under the Consumer Fraud Act, plaintiffs must prove a violation of the Act along with an "ascertainable loss ... as a result of the unlawful conduct." Id. at 344-45, 696 A.2d 793 (quoting Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473, 541 A.2d 1063 (1988)).
As defendant points out, the key focus of the common law fraud and Consumer Fraud Act claims is on whether there were material misrepresentations or omissions and their effect on plaintiffs. Although plaintiffs need not prove reliance under the Consumer Fraud Act, they must show an ascertainable loss as a result of defendant's conduct and a causal relationship. Because of the highly individual nature of these claims, proof of these elements poses special difficulties in the context of a class action. See Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279 (D.N.J.1997) for its persuasive reasoning on similar issues.
Plaintiffs must first identify the same or similar representations that were made to the entire class. This analysis includes a review of multiple different contracts, brochures and other publications, advertisements, and oral representations made by defendant's representatives before purchase of the cellular telephone services and plaintiffs' exposure to them. Plaintiffs must then prove how these representations or omissions impacted upon each plaintiff, that is, how plaintiffs were induced to purchase defendant's services. If all plaintiffs were parties to one uniform contract, proof of reliance may not be difficult, but when considering the variation in representations made to each plaintiff before purchase, proving reliance becomes extraordinary.
The same obstacles face plaintiffs on their negligent misrepresentation claim, except there, plaintiffs must prove that varying communications to plaintiffs were negligently made and that each plaintiff relied upon them, thus resulting in an ascertainable loss. A survey of the three named representative class members illustrates the different facts surrounding each contract and the alleged individual representations made by defendant to each plaintiff.
All three class representatives claimed different degrees of reliance on defendant's representations about its services. Whereas Kuhn testified that he purchased cellular services from defendant based on the promise of thirty free minutes, which was greatly reduced by the effect of the "send to end charges," Carroll stated that he purchased BAN Mobile cellular services based on the recommendation of his partners and for convenience because his partners were already subscribers. An individualized inquiry is necessary to determine how an alleged misrepresentation or omission by defendant would have impacted on Carroll's decision to subscribe to defendant's service. In contrast, Tyman claimed she purchased defendant's services based on her familiarity with defendant's name and did not see any print advertisements before purchasing cellular services from defendant.
Similarly, the amount of information given to plaintiffs by each representative regarding additional fees differed. When asked what information was conveyed before the purchase of cellular phone service, each plaintiff gave a substantially different response. Carroll testified that when he bought the telephone, he only saw the agreements themselves and did not recall conversations with *517 sales representatives regarding the services. Kuhn stated that he spoke to a sales representative for approximately forty-five minutes, without mention of additional charges, and Tyman claimed that she spoke with a sales representative and received an introductory pamphlet, which she did not read. More specifically, when asked about landline charges, both Carroll and Kuhn stated that they were never informed about landline charges and no such explanation of the term appears in their contracts. Tyman could not recall having a conversation about landline charges, but her signed contract specifically states that customers are responsible for landline charges.
Finally, there appear to be wide discrepancies in the amount of loss ascertained by each plaintiff and the form of recovery sought. Although all plaintiffs claimed they were charged undisclosed fees through the landline charges, the rounding up to the next full minute, and "send to end" billing, each sought different damages. Carroll sought to see his drops-offs end, tighter security to prevent cloning and the use of the PIN numbers, and full disclosure of the pricing policies before signing agreements. When asked what economic damages Kuhn sought through the litigation, he said, "I'm seeking thewell, I don't even know. I'm seeking, I guess, the difference between what I had been charged and what I should have been charged. I can't put a number on it." When pressed to give an amount overcharged from defendant's practices of rounding-up calls to the next full minute, Kuhn replied that he had no idea what that amount might be. Tyman responded similarly to the same question. She stated that she sought reimbursement for the rounding-up charges and the disconnection problems, but in terms of damages, she said that she did not seek an amount but only sought a change in future billing to make her charges more affordable.
Although defendant only provided snippets of the class representatives' depositions, there was enough provided to see the diversity of facts underlying the claims brought by each class representative and the individual questions that could well overwhelm the common issues shared by the plaintiffs. Unlike a mass tort or products liability action, this complaint is not based on the same set of operative facts. Each plaintiff had a different interaction with defendant's representatives, and the ability to prove reliance depends on circumstances peculiar to each plaintiff. There was considerable variation in marketing strategies for each region and the multiple schemes for explaining billing practices on landline charges, rounding off, and send to end calculations.[2]
This is not a case where individual suits will create similar actions that will produce redundant evidence. Rather, claims and possible defenses, such as limitation on liability clauses, arbitration requirements, and public utility tariffs are likely to differ. Because the claims of fraud and negligent misrepresentation do not arise out of the same transaction or similar facts, common issues do not predominate over the separate and distinct issues of law and fact. There may, however, be a different analysis under the New Jersey Consumer Fraud Act, where reliance may not be factor. But even if the claim is so limited, the questions of actual individual disclosures may preclude the claim. We leave this issue for reexamination by the trial judge.[3]

III.
Another critical question under R. 4:32-1(b)(3) is whether a class action is superior to other methods of adjudicating the issues.
*518 Defendant contends that the enormous size of the potential class, over one million customers, is too unmanageable for one court to handle. According to defendant, not even subdividing the class into subclasses would facilitate the unwieldy litigation. Wide variations in liability, state laws, and damages further complicate the ability of one court to adjudicate the matter as a class action.
Defendant made these same arguments to the trial judge but to no avail. The trial judge viewed the class action as manageable and stated that the class action "is far superior to any individual actions by persons allegedly aggrieved by the defendant's conduct." This may be so insofar as the nominal damages for each customer might not warrant a separate suit. However, insofar as there may be ills to be corrected in defendant's practices, injunctive relief in the courts could be sought, or federal or state administrative agencies might provide regulatory solace for plaintiffs.[4]
The trial judge then glossed over potential differences in state laws relevant to the adjudication of the issues and concluded that through the use of computers, the parties could organize the factual differences among the class members. Specifically, the court formulated a hypothetical system whereby the parties could generate a computer list of all class members and compare all the contracts to identify which class members received information about defendant's cellular service and which plaintiffs made their purchase without information. Individual damages claims could be calculated through a formula and any counterclaims by defendant precluding recovery could be factored into the damage formula.
The court oversimplified the litigation. The potential difficulties in managing this class action are multiplied exponentially when considering the application of multiple state laws. The differing choice of law provisions require an analysis of how each state law defines fraud and negligent misrepresentation. Once the court determines which state law applies, each claim must be investigated to identify which class members, if any, received misrepresentations or omissions of material facts. Because marketing schemes differed for each region, multiple subclasses would be required. Except as to the Consumer Fraud Act claims, each plaintiff would then be required to prove reliance on defendant's representations to their detriment. Only then could the parties organize the data according to the trial court's scheme. But where would defendant's right to cross-examine each plaintiff be accommodated? For example, a plaintiff who claimed to be defrauded but who renewed the contract for the next year would have a serious credibility problem.
Compounding these problems is the dispersal of the class, involving plaintiffs across the country.[5] As stated by the court in Delgozzo, "as the geographical diversity grows, the management problems increase commensurately." 266 N.J.Super. at 192, 628 A.2d 1080. See Castano v. American Tobacco Co., supra, 84 F.3d at 747 (finding that extensive manageability problems including difficult choice of law determinations, multiple subclasses based on variations in state laws, differing factual circumstances among class members, and the required notice to millions of class members, supports decertification).
The Eleventh Circuit's decision in Andrews v. American Telephone & Telegraph Co., 95 F.3d 1014 (11th Cir.1996) is instructive. There the Court of Appeals decertified two classes composed of customers who filed suit against several long-distance telephone companies. One group of plaintiffs alleged that pay-per-call telephone programs involving *519 sweepstakes promotions were illegal and violated RICO, and that defendants had committed mail and wire fraud by promoting illegal games of chance. Id. at 1019. A second group of plaintiffs charged the same allegations but involving credit card offers. Id. at 1021. Applying the language of Fed.R.Civ.P. 23(b)(3), the district court stated that common issues predominated and that individual issues could be adequately managed, and that class treatment was the only feasible method of adjudication given the small size of each member's claims. Id. at 1020. The lower court then certified a master class and a Georgia subclass. Ibid. The Court of Appeals disagreed and found that the district court had underestimated the management difficulties that would be encountered if the suit were allowed to proceed as a class action. Id. at 1023.
In the illegal gambling action, the court recognized insurmountable complications because of the need to assess each individual 900-number program to determine whether a particular program actually violated state gambling laws. Id. at 1024. Furthermore, the court acknowledged the need to scrutinize the gaming laws of each of the fifty states because of the different treatment of 900-number programs. Ibid. In the suit attacking the 900-number programs offering credit cards, the court found even more complications that precluded class certification because the credit card programs were not illegal, unless coupled with illegal means of solicitation such as mail or wire fraud. Ibid. Thus, to determine the illegality of the 900number programs, an examination of each of the differing advertising and solicitation techniques was required. Id. at 1024-25. The plaintiffs also needed to examine the extent of the disclosures made, and the existence and promotion of free participation in the programs. Ibid. But even if a scheme to defraud were uncovered, the court noted that plaintiffs would be required to show, on an individual basis, reliance on the misrepresentation, resulting injury, and a demonstrable amount of damages. Id. at 1025. Furthermore, there would be a need to reference fifty credit card and consumer protection laws. Ibid.
Except possibly for the New Jersey Consumer Fraud Act claims, similar complications threaten this class action. As in Andrews, resolution of the out-of-state consumer fraud claims and negligent misrepresentation claims would require an examination of multiple state laws because each contract contained a different choice of law provision. Some contracts were governed by Arizona law, but others, like the ones attacked by plaintiffs, were ruled by the laws of the State of New Jersey. Still other potential plaintiffs' contracts chose the laws of the state in which the contract was signed, and others chose to be governed by the law of the state encompassing the area code assigned to the customer's telephone number. One contract did not even contain a choice of law provision. In light of these complications in managing this litigation, the trial court failed to justify class action treatment.
In spite of the manageability problems, plaintiffs raise a valid consideration. Without class certification, what is the recourse for individuals who have suffered consumer fraud when the claims are small? This issue was addressed by the Supreme Court in In re Cadillac. The Court noted that a frequent characteristic of consumer class actions is that individual claims are too small to warrant litigation. 93 N.J. at 435, 461 A.2d 736. Consequently, wrongs may go without redress, and "the [defendant] may continue with impunity." Ibid. A class action is thus beneficial because it equalizes the ability of the parties to prepare and pay for the litigation. Ibid. Class certification is also an efficient procedural device for the courts to avoid the expense of litigating similar claims. Ibid. The Court, however, cautioned that a class action should not be viewed only as a procedural device that assists plaintiffs with small claims to challenge a common adversary; it is also "a means of providing a procedure that is fair to all parties and promotes judicial efficiency." Id. at 435-36, 461 A.2d 736.
To determine whether a class action is a superior method of litigating the case, *520 alternate procedures should be considered. Id. at 436, 461 A.2d 736; 5 Moore's Federal Practice § 23.48 (noting that "a class action must be better than, not merely as good as, other methods of adjudication"). Quoting from Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir.), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974), the Cadillac Court listed three considerations: "(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method." 93 N.J. at 436, 461 A.2d 736.
Here, the trial court failed to undertake this analysis. The trial judge never explained why a class action was superior and failed to compare the use of other alternate methods of adjudication. Furthermore, none of the factors listed in R. 4:32-1(b)(3) were considered, thus there was no consideration of the existence of other similar litigation commenced against defendant or of the interest of individual plaintiffs in pursuing separate claims. See Delgozzo, supra, 266 N.J.Super. at 193, 628 A.2d 1080 (finding similar flaws in the trial court's rejection of class certification). More importantly, the court only skimmed the surface when discussing manageability of the class action.
Although individual actions are clearly not economically feasible, possible alternatives for adjudicating plaintiffs' claims include the use of test cases, whereby one or more class members litigate the case with defendant's agreement that defendant would be collaterally estopped by adverse findings of fact when the remaining members bring suit. See Katz, supra, 496 F.2d at 760-61; Kronisch v. Howard Savings Inst., 143 N.J.Super. 423, 429-30, 363 A.2d 376 (App.Div.1976). As noted earlier, an injunctive relief claim might serve the ends of the plaintiffs who wished to improve service. If no judicial remedy is available, it may be the responsibility of federal or state regulators or the Legislature to administer existing laws or to design laws to compensate consumers when they have been injured by deceptive billing practices of cellular telephone purveyors. See In re Hotel Telephone Charges, supra, 500 F.2d at 92 (suggesting legislation as a means to compensate consumers damaged individually by illegal telephone charges).
When we analyze all of the factors, we come to the inescapable conclusion that, except possibly for the Consumer Fraud Act claims, a class action is inappropriate here on the record developed in the trial court. On remand, the trial court should be directed to sort through the considerations listed in In re Cadillac, keeping in mind the size of the class and the anticipated small amount of recovery to each class member, both of which favor a class action on the remaining New Jersey Consumer Fraud Act claims. But even as to these claims, the court should consider the manageability of lumping so many diverse factual and legal claims into one action, and the availability of alternative remedies.
We reverse the class certification with respect to all but the New Jersey Consumer Fraud Act claims, and remand the issue of class certification of those claims for reconsideration in accordance with this opinion.
NOTES
[1] Respondent Tyman's name (Rosalind) was misspelled in the trial court papers.
[2] Review of several brochures and contracts demonstrates varying degrees of disclosure to customers about billing practices. In some contracts and publications, information about rates and charges are fully explained, and they state that customers will be responsible for "send to end" billing, landline charges and calls billed to the next full minute. Other contracts offer less clear explanations.
[3] Insofar as there may be out-of-state claimants with similar statutes controlling, we refer the trial court to an earlier decision precluding such a claim here under the forum non conveniens doctrine. See Mandell v. Bell Atlantic NYNEX Mobile, ___ N.J.Super. ___, ___ A.2d ___, No. SOM-L-2119-95 (Law Div. Mar. 27, 1997). The importance of this case causes us to relax R. 1:36-3.
[4] A nationwide class action costing sizable sums to both sides in legal expenses, and apparently resulting in unspecified but possibly nominal returns to each plaintiff, should be built on a firmer foundation. The courts are not in the business of providing a forum where the only practical result is the generation of huge attorneys' fees.
[5] Plaintiffs attempt to represent others similarly situated in at least seventeen states including Massachusetts, Connecticut, Vermont, New Hampshire, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, West Virginia, Maryland, North Carolina, South Carolina, Georgia, Arizona, Texas, New Mexico, and Washington, D.C.