904 A.2d 736 (2006)
387 N.J. Super. 405
Michelle ILIADIS and Angela Nelson-Croxton, individually on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
WAL-MART STORES, INC., a Delaware Corporation, Sam's Club, an operating segment of Wal-Mart Stores, Inc., Derrick Zimmer, and Glen Spencer, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 8, 2006.
Decided August 15, 2006.
*737 Christopher J. Hanlon, Morristown, and Judith L. Spanier (admitted pro hac vice) argued the cause for appellants (Hanlon & Niemann; Abbey Spanier Rod Abrams & Paradis; and Bader & Associates, attorneys; Mr. Hanlon, Ms. Spanier and Gerald Bader, of counsel and on the brief).
Michael K. Furey argued the cause for respondents (Riker, Danzig, Scherer, Hyland & Peretti and Paul, Hastings, Janofsky & Walker, attorneys; Mr. Furey, of counsel and on the brief; Ronald Kreismann (admitted pro hac vice), of counsel; K. Lesli Ligorner, on the brief).
Before Judges WEFING, WECKER and GRAVES.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Plaintiffs appeal, pursuant to leave granted, from the trial court's order denying their motion for class certification. After reviewing the record in light of the contentions advanced on appeal, we affirm.
Plaintiffs Michelle Iliadis and Angela Nelson-Croxton are both former employees of Wal-Mart Stores, Inc. Plaintiff Iliadis worked as an associate and as a cashier from December 1998 to July 2001 at two locations in New JerseyBerlin and Turnersville. Plaintiff Nelson-Croxton worked as a cashier from November 1996 to March 1999 at the Berlin store. Defendants Derrick Zimmer and Glen Spencer were the store managers at Berlin and Turnersville, respectively, during the period of plaintiffs' employment.
Plaintiffs have filed an eleven-count complaint asserting claims for breach of contract (express contract, implied-in-fact contract and unilateral contract); breach of the covenant of good faith and fair dealing; violation of New Jersey's State Wage and Hour Law, N.J.S.A. 34:11-56(a)(4); *738 violation of N.J.A.C. 12:56-5.2; restitution; and unjust enrichment. The underlying premise to their complaint, in which they seek relief both for themselves, individually, "and all others similarly situated" is that they were made to work "off-the-clock" and that they did not receive the rest breaks and meal breaks to which they were entitled.
Plaintiffs moved for class certification on all counts of their complaint other than those alleging breach of an express contract. After extensive discovery and comprehensive briefing, the trial court heard oral argument on the motion. Following that argument, the trial court denied the motion, setting forth its reasons in a twenty-five page written memorandum of decision.

I
Wal-Mart is reputedly the largest private employer in the world. Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 141 (N.D.Cal.2004). According to its 2006 Annual Report, it has forty Wal-Mart stores in New Jersey, nine Sam's Club stores and one Wal-Mart Supercenter. Wal-Mart Investors, http://media.corporate  ir.net/media  files/irol/11/112761/2006  annual  report.pdf (last visited Aug. 1, 2006).
It is not surprising, given its size, that it has extensive written policies governing the work hours and break times for its employees. Wal-Mart Corporate Policy # PD-07 is applicable to all associates, including salaried, hourly, full-time, peak-time and temporary, as well as some salaried members of management, and governs break periods and meal periods at all Wal-Mart stores. Any associate who works less than three consecutive hours is not entitled to any break period. An associate who works from three hours to six hours is entitled to one uninterrupted paid break of fifteen minutes. An associate who works more than six consecutive hours is entitled to at least two paid uninterrupted fifteen minute breaks.
An associate's immediate supervisor is responsible for scheduling these breaks, and a supervisor who fails to do so is subject to disciplinary action. At the time of plaintiffs' employment with Wal-Mart, employees were required to swipe their time cards when starting and ending their breaks. Wal-Mart changed this procedure in February 2001; thereafter, employees were no longer required to clock out or clock in for their rest break periods. Wal-Mart attributed this change in procedure to the fact that employees are paid for their rest break periods, and thus there is no need for associates to swipe their time cards at the start and the end of their break periods.
This same Corporate Policy contains the rules governing meal breaks. Those associates who work for more than six hours are entitled to a meal break of at least thirty minutes. With the approval of a supervisor, that may be extended to sixty minutes. Associates are not paid for the time they are on meal breaks, as opposed to the time they are on rest breaks. Supervisors are responsible for scheduling meal breaks for the associates under them and are subject to disciplinary action for failure to do so.
Supervisors or management may not ask or direct an associate to perform any work while the individual is on a rest break or a meal break. The Corporate Policy places an affirmative duty on associates to comply with the rules governing rest breaks and meal breaks. Specifically:
Associates are to take full, timely, uninterrupted breaks and meal periods. Associates will be subject to disciplinary action for failing to clock in or out for *739 meal periods, missing meal periods, or taking meal periods that are too long, too short or untimely. Associates will also be subject to disciplinary action for missing breaks or taking breaks that are too long, too short or untimely. Supervisors and salaried members of management will also be subject to disciplinary action for interrupting or failing to provide breaks, meal periods, and/or days of rest in accordance with policy and state laws.
Wal-Mart Corporate Policy # PD-43 deals with the necessity to keep complete and accurate records of time worked. It states "[n]o Wal-Mart Associate should perform work for the Company without compensation." It defines "off the clock" as work that is performed while time is not recorded, not maintained by an automated timing device or not tracked manually. All associates paid on an hourly basis are required to clock in and clock out at the beginning and end of their shifts and their meal periods. An associate or supervisor who violates this policy is subject to discipline, including termination.
In the event that an employee does work off the clock, Wal-Mart has a procedure to see that the employee is compensated for that time. The Time Clock Punch Error Report is a daily report which tracks errors made by associates in clocking in and clocking out. The report lists all associates whose time records are missing an entry; all errors listed on the report must be corrected before the daily or weekly payroll hours can be finalized.
Wal-Mart employs a Time Adjustment Sheet to make written corrections or changes to the Time Clock Punch Error Report. Associates fill out a Time Adjustment Sheet to make any corrections to their time records; that sheet is signed by the associate, his or her supervisor and a member of management. Corrected Time Adjustment Sheets must be attached to the Time Clock Error Reports.
The policies for rest breaks, meal breaks and accurately recording the hours worked are explained to new associates as part of their orientation. All new associates are provided with an Orientation Packet which sets forth the respective policies. In addition, all new associates receive the Associate Handbook, which contains a section explaining these policies and procedures. The Handbook makes clear that each associate is expected to record his/her own time. It states:
[a]lways clock in to begin your workday and at other appropriate times; ask your Supervisor for specific details. If you forget to do this, notify your Supervisor immediately so corrections can be made.... Remember that working off the clock is not only against Wal-Mart policy  it's against the law. Always clock in when you are working  Always! There are no exceptions.
In this action, plaintiffs allege that the reality of the Wal-Mart work place does not accord with these written policies. They contend that the result of Wal-Mart's emphasis on keeping down labor costs and increasing profits is a disregard of these written policies and the creation of a work atmosphere in which associates work through their rest breaks and meal breaks and work off the clock. They seek relief, both for themselves and for a class which they have defined as "all current and former hourly employees of Wal-Mart in the state of New Jersey from May 20, 1996 to the present."
The parties engaged in a period of discovery in preparation for plaintiffs' motion for class certification. Plaintiffs submitted two expert reports, one prepared by Martin M. Shapiro, Ph.D., a professor at Emory University, and one by L. Scott Baggett, Ph.D., a consulting statistician.
*740 In preparing his report, Shapiro analyzed various data sources, including Wal-Mart's "Week-to-Date Hours and Expense Summary," "FT/PT Associate Exceptions Report," "Time Clock Activity Log," "Time Clock Archive Report," "Time Clock Punch Error Report," "Time Clock Punch Exceptions Report," and "Week-to-Date Supervisor Expense Summary." He also received a CD-ROM and three DVD-R discs containing computerized personnel and payroll files for New Jersey for the applicable time period. In his report, Dr. Shapiro stated that he had available to him:
all data generated by each individual employee's badge swipes into the time clock system, including date, hour, minute, associate identification number, employee social security number, time-clock number and type of time clock swipe (e.g., swipe in, break start, break end, meal start, meal end, swipe out, request for schedule, request for weekly hours, and rejected swipe.)
He noted that the material provided to him also included:
all data generated by each individual editing of the hourly employee time and attendance records entered by store managers and personnel managers.... Changes to the time and attendance records result[ed] in records containing the original date and time, the new date and time, the name of the manager performing the edit, as well as the location, date and time on which the editing took place.
After reviewing and analyzing this material, he expressed the following opinions:
[A] substantial number of hourly employee time-clock entries are either altered or created by store managers and personnel managers [and that] managerial personnel create large numbers of employee time-clock entries at the end of each weekly payroll period and that these ... entries include additions which generate lunch-breaks of exactly thirty-minute or sixty-minute duration on each of the previous days of the week....
It is my opinion that the data which I reviewed demonstrated a pervasive and consistent pattern of missed meal breaks in all stores . . . [and] that there is a consistent and pervasive pattern of missed rest breaks in all stores....
A preliminary analyses [sic] of these New Jersey data revealed that the clock-time and attendance of sales employees decreased at the end of payroll periods, even though customer and item sold volume increased at the end of payroll periods. These results are an aggregate indication of off-the clock work....
Baggett prepared two reports. In his first, he reported the results of his analysis of time clock data from six Wal-Mart stores in New Jersey, including the Berlin and Turnersville stores. He concluded that 68% of the shifts were deficient in earned number of breaks and that approximately 93% of the Wal-Mart associates experienced a deficiency in the length of their rest and meal breaks.
After preparing this report, Baggett reviewed an internal audit that Wal-Mart had prepared, the "Shipley Audit." That audit involved an examination of 128 stores and uncovered 76,472 exceptions in a one-week period. Of the time clock exceptions found by the Shipley Audit, 21% were for too few meal breaks and 79% were the result of too few rest breaks. According to Baggett, the conclusions he reached from his analysis were statistically similar to those in the Shipley Audit. He also noted that 94.7% of the associates in his sample had at least one rest break and/or meal break shortfall per pay period and *741 that 62.6% were shorted at least five rest and/or meal breaks.
Wal-Mart submitted a responding expert's report, prepared by Paul F. White, Ph.D., which criticized the methodology and findings of the Shapiro and Baggett reports. White stated that both Shapiro and Baggett incorrectly assumed that a missed punch was equivalent to a missed break. White concluded this assumption was incorrect based upon certifications of Wal-Mart associates provided to him stating that associates did not clock out for breaks because they were being paid for them. In addition, he said the reports failed to account for meal periods being taken at the end of a shift as well as the possibility that an associate could voluntarily miss a break or take a shorter break for personal reasons, such as being able to leave earlier. He also criticized what he perceived as methodological flaws in the approaches used by Shapiro and Baggett.
The Shipley Audit to which Baggett referred and compared his results was prepared in July 2000 and reported on visits to 128 Wal-Mart stores. It concluded that a large percentage of employees at these stores were not receiving the rest and meal breaks due them and were working hours that were inconsistent with their job classifications.
To counter Baggett's statistical analysis and his statement that his findings compared favorably with the results of the Shipley Audit, Wal-Mart submitted the certification of the individual who prepared the guidelines under which the Shipley Audit was conducted. She certified that when she prepared these guidelines, she had erroneously understood that a missed time card swipe equaled either a missed meal break or rest break. She subsequently learned that was incorrect. The result of her misunderstanding, which was not corrected prior to the audit being conducted, Wal-Mart contended, was that the Shipley Audit was conducted under an incorrect premise, and thus its results were fundamentally flawed.
In addition to the respective expert reports, both sides filed certifications. Plaintiffs submitted five certifications from individuals who had worked in Wal-Mart stores in New Jersey. According to their certifications, these individuals were routinely not permitted to take their breaks and were required to work off the clock without compensation. Wal-Mart submitted responding certifications from employees who stated they were regularly permitted to take their breaks, were never asked or directed to work off the clock, and, if they had done so, they were properly compensated. These employees also certified that they had been made aware of Wal-Mart's policies during orientation.

II
Justice Pollock summarized the development of class action litigation thusly:
Class actions originally developed in equity as a means of consolidating numerous claims involving common issues in a single action. As time passed, certification of a class became a means of maintaining an otherwise uneconomical action. By permitting claimants to band together, class actions equalize adversaries and provide a procedure to remedy a wrong that might otherwise go unredressed.
[In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 423-24, 461 A.2d 736 (1983) (internal citations omitted).]
In New Jersey, class certification is governed by R. 4:32-1, which, in turn, is modeled after Rule 23 of the Federal Rules of Civil Procedure. Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 41, 752 A.2d 807 (App.Div.2000). Four *742 threshold requirements must be satisfied for an action to be certified as a class action: numerosity, commonality, typicality and adequacy of representation. Muise v. GPU, Inc., 371 N.J.Super. 13, 30, 851 A.2d 799 (App.Div.2004); Saldana v. City of Camden, 252 N.J.Super. 188, 193, 599 A.2d 582 (App.Div.1991). A plaintiff must establish that:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
[R. 4:32-1(a).]
In addition to satisfying the four threshold requirements in R. 4:32-1(a), a plaintiff must also satisfy one of the three alternative requirements stated in R. 4:32-1(b), under which an action may proceed as a class action if:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of either (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.
The party who is seeking class certification bears the burden of establishing that the matter complies with these rule requirements. Muise, supra, 371 N.J.Super. at 32, 851 A.2d 799. Because of the ability of a class action to level the playing field between adversaries, "New Jersey courts, as well as federal courts construing the federal class action rule after which our rule is modeled, have consistently held that the class action rule should be liberally construed." Delgozzo v. Kenny, 266 N.J.Super. 169, 179, 628 A.2d 1080 (App.Div.1993). Thus, "a class action `should be permitted unless there is a clear showing that it is inappropriate or improper.'" Id. at 180, 628 A.2d 1080 (quoting Lusky v. Capasso Bros., 118 N.J.Super. 369, 373, 287 A.2d 736 (App. Div.1972)).
A trial court confronted with a motion for class certification should afford the plaintiffs "`every favorable view' of plaintiffs' complaint and the record." Varacallo, supra, 332 N.J.Super. at 42, 752 A.2d 807 (quoting Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 223, 294 A.2d 7 (1972)). It should, at the same time, undertake a "rigorous analysis" to determine *743 if the requirements of R. 4:32-1 have been satisfied. Carroll v. Cellco P'Ship, 313 N.J.Super. 488, 495, 713 A.2d 509 (App. Div.1998). In deciding a motion for class certification, "`a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" Ibid. (quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996)).
The trial court concluded that the plaintiffs satisfied the first four requisites of numerosity, commonality, typicality, and adequacy of representation. Wal-Mart did not seek leave to cross-appeal that determination, and thus we deem it, at least for the purposes of the appeal before us, to be unchallenged.
Plaintiffs contended that they satisfied the third of the three alternative requirements of R. 4:32-1(b), predominance and superiority. Under this provision, the court must conclude "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members...." R. 4:32-1(b)(3). In seeking to establish predominance, "all issues need not be identical among all members of the class; common questions must simply predominate." Saldana, supra, 252 N.J.Super. at 197, 599 A.2d 582. Further, "[t]he predominance requirement is more demanding than the commonality requirement." Muise, supra, 371 N.J.Super. at 37, 851 A.2d 799.
The trial court here concluded that plaintiffs had failed to establish predominance, and it is that issue which is before us on appeal. More specifically, R. 4:32-1(b)(3) sets out three factors a court must weigh in considering predominance; the trial court here found these plaintiffs satisfied the first two but not the third, "the difficulties likely to be encountered in the management of the class action."
Saldana, supra, illustrates the analytical distinction between commonality and predominance. Plaintiffs in that action owned various properties in the City of Camden that had been damaged or destroyed by fires that began in abandoned dwellings owned by the City. 252 N.J.Super. at 191, 599 A.2d 582. The trial court granted plaintiffs' motion to proceed as a class action, but this court reversed.
[T]he centerpiece of plaintiffs' theory of liability is that the properties of prospective class members were damaged or destroyed by fire caused by defendants' failure to implement or administer a policy concerning City-owned structures. This theory is clearly common to all class members. However, commonality becomes obscured when the probable unique issues of liability, causation and damages in each case are considered, requiring individualized treatment at trial. It is alleged that over 80 privately-owned dwellings were damaged by 62 separate fires over a six-year period. Some were caused by arson; some had undetermined origins. The cause of each fire, and whether the absence of a City protective or maintenance policy contributed to it will, no doubt, be fact-sensitive issues resolved by fact-specific proofs.
[Id. at 197, 599 A.2d 582.]
Muise, supra, is a recent example of another attempted class action that foundered on the predominance requirement. Plaintiffs in that case were customers of the defendant utility who sought damages after they experienced power outages over the 4th of July 1999 weekend. 371 N.J.Super. at 18, 851 A.2d 799. During that weekend approximately 250,000 customers lost power. Id. at 21, 851 A.2d 799. The bulk of the outages occurred *744 predominantly in Monmouth and Ocean counties. Id. at 23, 851 A.2d 799. Defendant attributed these outages to a number of different problems, including equipment failures, deliberate shut-offs to permit workers access to equipment, protective devices that were triggered, lightning and car accidents. Id. at 21, 851 A.2d 799. Plaintiffs, on the other hand, alleged that GPU had been operating with a deficiency in reactive power, and its failure to install two larger transformers in Red Bank and perform various upgrades caused the outages. Id. at 22-23, 851 A.2d 799. Although the matter had been originally certified as a class action, the trial court, after a period of discovery, issued an order decertifying it. Id. at 26-27, 851 A.2d 799. On appeal, we affirmed that decertification, finding it "justified by the predominance of individual causation issues." Id. at 37, 851 A.2d 799.
In deciding that the matter should be decertified, the trial court noted that individual damages issues would predominate over common ones. Id. at 41, 851 A.2d 799. In doing so, it rejected class-wide proof of damages, finding "that a court should depart from the general preference for individualized proof only where a reliable mathematical formula is available and the court can presume that all class members suffered damage." Id. at 47-48, 851 A.2d 799. Judge King, writing for this court, affirmed that determination. Id. at 52, 851 A.2d 799. In the course of his opinion, Judge King noted Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir.2001), in which that court rejected class-wide proof of damages, saying, "[w]hile obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss on a common basis. As noted, the issue is not the calculation of damages but whether or not class members have any claim at all." Muise, supra, 371 N.J.Super. at 49, 851 A.2d 799 (quoting Newton, supra, 259 F.3d at 189).
The trial court in this matter pointed out in its memorandum of decision a number of factors that led to its determination in this regard, all revolving around the court's view that individual factual determinations would have to be made of the circumstances under which a particular employee missed a break or worked off the clock. We are satisfied that the trial court was correct in this regard. Defendant should be entitled to establish, if it can, that employees voluntarily chose to work through rest breaks or meal breaks for personal reasons. It should also be entitled to establish that claims of employees working off the clock are due to errors in the computer records or in plaintiffs' various analyses of those records.
In our judgment, the expert reports submitted by plaintiffs fail to resolve the individual issues of liability. They fail to account for variability in employee conduct and incorrectly assume that a missed punch is equivalent to a missed break.
In its 2006 Annual Report, Wal-Mart noted that it has been subject to suit on similar claims in a number of states. According to that Annual Report, class certification has either been denied or overturned in fifteen jurisdictions and granted in nine. Our research has uncovered seven reported decisions from these other jurisdictions: Ouellette v. Wal-Mart Stores, Inc., 888 So.2d 90 (Fla.Dist.Ct.App. 2004); Wal-Mart Stores, Inc. v. Bailey, 808 N.E.2d 1198 (Ind.Ct.App.2004); Basco v. Wal-Mart Stores, Inc., 216 F.Supp.2d 592 (E.D.La.2002); Harrison v. Wal-Mart Stores, Inc., 170 N.C.App. 545, 613 S.E.2d 322 (2005); Petty v. Wal-Mart Stores, Inc., 148 Ohio App.3d 348, 773 N.E.2d 576 (2002); Wal-Mart v. Lopez, 93 S.W.3d 548 (Tex.App.2002); and In re Wal-Mart Employee *745 Litigation, 711 N.W.2d 694 (Wis.Ct. App.2006). All of these have rejected class certification.[1]
In Ouellette, supra, the plaintiffs were current and former Wal-Mart employees in Florida who made similar allegations of being forced to work off the clock. 888 So.2d at 91. The trial court denied class certification on the basis of the need for individualized proof of damages; the appellate court affirmed, not on that basis, but because the class was overbroad because it included members who had never worked off the clock. Id. at 91-92.
A similar result occurred in Bailey, supra. Plaintiff Bailey was a former Wal-Mart employee in Indiana who alleged she had been forced to work off the clock, and she sought to have her suit certified as a class action. 808 N.E.2d at 1199. The trial court granted class certification, id. at 1200, and the appellate court reversed, finding that the class included members who had no standing because they had never had to work off the clock. Id. at 1204.
In Basco, supra, the federal district court in Louisiana denied plaintiff's application to certify the matter as a class action. 216 F.Supp.2d at 602. It analyzed the federal rule requirements in detail, id. at 598-602, and concluded, as did the trial court here, that plaintiff was unable to satisfy the requirement of predominance. Id. at 603. It also held that statistical proof of damages, such as these plaintiffs put forth, could not overcome Wal-Mart's right to assert individualized defenses to claims of having been compelled to work off the clock. Ibid.
In Petty, supra, the reviewing court affirmed a trial court order denying class certification to a suit brought by Ohio Wal-Mart employees who alleged they had been forced to work off the clock and through their rest and meal breaks. 773 N.E.2d at 577-78. The plaintiffs put forth two possible definitions for the scope of the class. The first consisted of all Wal-Mart employees "who were required or permitted to work off the clock or miss breaks and meals." Id. at 579. The plaintiffs proposed to identify class members through Wal-Mart's business records and time clock exceptions. Ibid. In rejecting this proposed class definition, the court stated:
Even if the [time clock] report shows that an employee missed a break or meal, it does not give the reason for the missed break. An employee may have forgotten to punch out but still took a break, skipped a break to refrain from smoking, or skipped a break to leave work early. These records clearly do not tell the Court whether an employee missed a break because she was required or permitted to by Wal-Mart.
In addition, time clock records only show the hours of work for which the employee was `on the clock.' These records will not assist the Court in determining which employees were required or permitted by Wal-Mart to work off the clock. Determining which employees are members of the class will require an inquiry into the facts of each employee's case.
[Id. at 579.]
Plaintiffs, perhaps in an effort to head off those potential problems, later amended *746 their proposed class definition to include all past and present Ohio Wal-Mart employees. Id. at 580. The court rejected this definition because it included individuals who had never been forced by Wal-Mart to work off the clock, saying that it had "been expanded so far beyond any rational relationship to the plaintiffs' theory of recovery that no common issues predominate." Id. at 581. In finding that the plaintiffs in Petty had failed to satisfy the requirement of predominance, the court said that plaintiffs had:
failed to demonstrate the existence of a single issue in this case that is susceptible to proof or disproof by a body of general evidence applicable to the entire class. Without at least one issue that can be determined on a class-wide basis, there is no point to adjudication by means of a class actions  every issue in the case will have to be determined by individual adjudication, with evidence unique to that particular class member.
[Id. at 582.]
In Harrison, supra, the North Carolina Court of Appeals upheld a trial court ruling denying class certification to a matter filed by former Wal-Mart employees alleging they had been forced to work through their breaks and off the clock. 613 S.E.2d at 324. The court agreed that the class definition (all current and former employees of Wal-Mart in North Carolina on or subsequent to November 29, 1997), id. at 325, was not feasible and that individual issues predominated. Id. at 328.
In Lopez, supra, the Texas Court of Appeals reviewed a trial court order granting class certification brought on behalf of Wal-Mart employees in Texas. On appeal, the court reversed, finding that individual issues would predominate. 93 S.W.3d at 552.
Finally, the Wisconsin Court of Appeals recently affirmed a trial court order denying class certification in a suit brought by hourly employees of Wal-Mart in Wisconsin. In re Wal-Mart, supra, 711 N.W.2d at 695. The court stated:
the major thing that makes the proposed class unmanageable is that the statistics upon which the class must rely were generated in the first instance by the proposed class members....
Although the plaintiffs attempt to characterize the trial court's `manageability' analysis as an inquiry into `why' an employee might have missed a break, the issue not `why' but whether the employees' self-generating data accurately reflect that a break was missed at all.
[Id. at 696.]
The Wisconsin court also rejected the plaintiffs' attempt to rely upon the same type of statistical analysis as plaintiffs put forth here.
Simply put, Wal-Mart is entitled to have the plaintiffs' statistical conclusions and all the underlying data tested by discovery and examination at trial. Although the Wal-Mart data would be admissible against Wal-Mart at any trial ... Wal-Mart would not, of course, be foreclosed from challenging the accuracy of that data, especially because much of it was generated in the first instance by the members of the proposed class.
[Id. at 698.]
In reviewing a trial court order granting or denying class certification, we are charged with determining whether the trial court abused its discretion. In re Cadillac, supra, 93 N.J. at 436-37, 461 A.2d 736; Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co., Inc., 384 N.J.Super. 275, 283, 894 A.2d 1136 (App.Div.2006); Muise, supra, 371 N.J.Super. at 29, 851 A.2d 799. Having reviewed this record and considered the governing legal principles, we are unable *747 to conclude that the trial court's order represents an abuse of discretion, and it is affirmed.
Affirmed.
NOTES
[1] Both parties have submitted to us a number of unreported decisions, which we have chosen not to address. R. 1:36-3. Earlier in this opinion, we noted Dukes v. Wal-Mart, supra, a matter in which class certification was granted. That suit, however, is directly distinguishable because it revolved around a claim of gender discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq.