**Nancy RYAN, on behalf of herself and others similarly situated, Plaintiff,**

v.

**ELI LILLY & COMPANY et al., Defendants.**

**Civ. A. No. 77–246.**

United States District Court, D. South Carolina, Columbia Division.

July 10, 1979.

Thomas H. Bleakley, Charfoos & Charfoos, Detroit, Mich., Terry E. Richardson, Jr., Ronald L. Motley, Barnwell, S. C., for plaintiff.

James W. Alford, Alford & Johnson, Columbia, S. C., for Upjohn Co.

William L. Pope, Columbia, S. C., Martin J. Schwartz, New York City, for Eli Lilly Co.

Charles E. Carpenter, Jr., Richardson, Plowden, Grier & Howser, Columbia, S. C., for Blue Line Chemical Co.

E. W. Laney, III, Turner, Padget, Graham & Laney, Columbia, S. C., for Abbott Laboratories.

Glenn Bowers, Columbia, S. C., for Rexall Drug Co.

Edward W. Mullins, Jr., Columbia, S. C., for E. R. Squibb & Sons, Inc.

Douglas McKay, Jr., Columbia, S. C., for McNeil Laboratories, Inc.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon plaintiff's motion for certification of this cause as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. It is the opinion of this Court that class certification must be denied. In reaching this decision the words of Advisory Committee, during its 1966 revision of Rule 23, were most persuasive:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

The plaintiff in this action is Nancy Ryan, a twenty-four year old woman who developed "pre-cancerous lesions" which she contends were the result of prenatal exposure to a synthetic estrogen taken by her mother in 1952 and 1953. Miss Ryan alleges that this synthetic estrogen was manufactured by Eli Lilly and Company or by E. R. Squibb and Sons, Inc. While Miss Ryan does name several synthetic estrogens as the possible anti-abortion medicine taken by her mother, since Lilly and Squibb, only, manufactured diethylistilbestrol (DES) it may be assumed that this is the chemical in question with respect to the named plaintiff. That is, of course, if Mrs. Ryan did in fact use a Lilly or Squibb product, a fact which is not beyond question. In addition to Lilly and Squibb, Miss Ryan has joined the Rexall Drug Company, The Upjohn Company, The Blue Line Chemical Company, Abbott Laboratories and McNeil Laboratories, Inc. as party defendants, alleging their production of synthetic estrogens.

The plaintiff seeks to represent a class composed of "all those females who are residents of the State of South Carolina who were exposed to the risk of development of vaginal cancer and other conditions due to the use, by their mother during pregnancy of drugs manufactured by the defendants."

The plaintiff states various causes of action including: negligence, breach of warranty, strict liability, civil conspiracy, fraud and deceit and violation of the Federal Food, Drug and Cosmetic Act of 1938. Based on these theories the plaintiff demands actual as well as punitive damages. By way of mandatory injunctive relief the plaintiff requests that this Court should create (and apparently administer) a trust fund to "provide medical examinations, and research programs to determine the cause, prevention, and cure of the cancer which is caused by the use of defendants' products and which will allow for publicizing the dangers to the public and medical profession."

In June of 1974 Miss Ryan was informed by her gynecologist that she had cervical and vaginal adenosis.[1] A subsequent biopsy confirmed that her condition was benign. Miss Ryan suffers no physical pain from this condition nor does she require any medication. Indeed she has no physical symptoms at all (N. Ryan Dept. p. 92–145). Neither her usual physical activities nor her sexual activities have been bothered by this condition. Apparently, plaintiff's claim for damages is based upon the alleged emotional distress which she has suffered.

Q. Have you ever had periods of depression that you were concerned about?

A. Well, I've had depressions.

Q. When?

A. Just regular depressions.

Q. Just off and on over the years?

---

1. Vaginal adenosis is the occurrence of columnar epithelium or its mucin by-products in the vagina, where normally squamous epithelium would appear. Adenosis is benign and it has never been observed to progress into clear cell cancer. In fact, there is evidence that adenosis is a self-limiting condition and tends to undergo spontaneous involution. This process may be so complete as to result in its complete replacement by squamous epithelium. Most doctors do not believe adenosis requires any treatment, only periodic observation.

A. Yeah, more so since I got this. [N.Ryan Dep. 70–71]

Q. And the only problems you have as a result of being told that is depression problems that you say you've had since that time?

A. Um. hum.

Q. And that is brought about by some concern that at some future examination the doctor may say something is wrong. Is that right?

A. Right.

[N.Ryan Dep. 145–46]

These periods of depression occur on the average of twice a month and last "just a night". Miss Ryan has never taken any drugs for her depression and has never consulted a psychiatrist, psychologist, or mental health clinic concerning her mental condition. [N.Ryan Dep. 71–148]

In 1971 Dr. Arthur Herbst and his colleagues established a statistical association between the use of DES by pregnant women and the development in their daughters of clear cell adenocarcinoma of the vagina some 15 to 20 years later. (284 New England J. of Med. 878, April 22, 1971). The Food and Drug Administration reacted to this report by disseminating a bulletin to all physicians, alerting them of "this previously unsuspected health problem" and further urging them to "assist FDA case-finding and to protect any patients who might be at risk." Physicians were also cautioned against further use of synthetic estrogens in controlling pregnancy problems. All manufacturers deleted pregnancy indications from their labels and product literature and added warnings against administration to pregnant women.

No causal relationship between maternal ingestion of DES and cancer has been established by anyone. Dr. Herbst stated in a May 1977 article that the association reported by him in 1971 did not establish any cause and effect relationship. Dr. Herbst went on to say that the incidence of cancer in offspring exposed to the estrogens is rare with an occurrence rate perhaps as low as one in 10,000.

Based on the above enumerated facts this Court must now determine whether or not the instant case may be maintained as a class action as directed by Rule 23(c)(1).

It is elementary that the proponent of a class action has the burden of establishing a right to class certification under Rule 23. *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc); *Carracter v. Morgan*, 491 F.2d 458 (4th Cir. 1973); *Poindexter v. Teubert*, 462 F.2d 1096 (4th Cir. 1972). The burden of proof in this regard includes a showing under paragraph (a) of Rule 23 that:

(1) [T]he class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Since the plaintiff seeks money damages under 23(b)(3) her burden in a class certification includes a showing that questions of law or fact, common to the class asserted, predominate over individual issues. The predominance issue in a money damages suit is often evaluated in lieu of the "common issues of law and fact" analysis under 23(a)(2). In Wright & Miller, Vol. 7 Federal Practice and Procedure, § 1763 at p. 610 (1972) it is stated:

Finally, an action is maintainable under Rule 23(b)(3) only if there is a finding that common questions predominate over individual issues. Since this obviously is a more stringent standard than that prescribed by Rule 23(a)(2), subdivision (a)(2) would be satisfied anytime the court finds that subdivision (b)(3) test has been met. Not surprisingly, therefore, a few courts in actions brought under subdivision (b)(3) have not drawn a distinction between the two requirements. They either have dealt with the common-issue question simultaneously with their inquiry into whether common questions predominate or have assumed that Rule 23(a)(2) was satisfied and thought it nec-

essary only to rule on the question whether the suit fit within subdivision (b)(3). This Court will follow the latter approach and jump ahead to the 23(b)(3) predominance analysis.

While Rule 23(b)(3) clearly provides that questions of law and fact common to the purported class must predominate over individual issues, the exact meaning of the word predominate remains unclear. Apparently it is not sufficient that common question merely exist, rather the common issues must outweigh the individual ones in terms of quantity or quality. In deciding the issue of predominance this Court must predict the evidence likely to be introduced at trial. This is particularly true when purported class members are not standardized. See *Windham v. American Brands, Inc.*, 68 F.R.D. 641 (D.S.C.1975). Standardized in this sense refers to a class of individuals whose claims against a common defendant arise out of essentially identical fact patterns. The case at bar presents a different class of plaintiffs. The mothers of the proposed plaintiffs in this case each used a synthetic estrogen; however, the length of exposure, the reason for the drug's use, the specific chemical formulation of the drug, the state of the art at the time of consumption or the manufacturer's knowledge of synthetic estrogen's carcinogenic effect and possible medical result in the absence of the estrogens are all specific points going toward proximate causation which will require proof for each individual class member. The Court is aware of decisions such as *Samuel v. University of Pittsburgh*, 506 F.2d 355 (3rd Cir. 1974); wherein a bifurcation of trials between the liability and damages issues was held appropriate. Bifurcation here would not cure the deficiencies of the instant class action, since the liability issue alone will require individual proof as to each party plaintiff. It is the necessity of such separate evidentiary showings that leads this Court to conclude the common questions of fact do not predominate.

In addition to the question of predominance, Rule 23(b)(3) also requires that before a class is certified it must appear that a class action is superior to other methods for "fair and efficient adjudication of the controversy."

"The superiority element has two facets, although these may not appear as separate in many cases. That is, this criterion should be measured by determining whether it would be worthwhile for the judge and the parties to devote the time and attention necessary to formulate workable methods for disposing of the group claims within one representative action, and, furthermore, whether it would be just to do so even if it would be convenient. (footnote omitted)" 3B Moore's Federal Practice, § 23.45[3], (1974 Edition).

This common sense approach is most appealing. In deciding a certification problem the judge merely evaluates the probable efficiency of a class action as compared to the available alternative. Only after an affirmative decision on this first question will the judge weigh the possible prejudicial effects of class status on each individual plaintiff's claim. In the case at bar this second issue need never be addressed, since the plaintiff's theory so clearly fails the first analysis.

The same problem confronted on the predominance issue, that of multiple proof as to causation, again is controlling. A class situation is simply not efficient when so much in the way of individual proof by each of the class members will obviously be required. Class status under the instant fact pattern would clearly render the suit unmanageable. In *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (*en banc*) the district court's role in finding manageability:

Primarily, the decision of the district judge turned upon a finding of the unmanageability of the action as a class action considered under the requirements of Rule 23(b)(3). In any review of either a grant or denial of class certification on grounds of manageability under Rule 23(b)(3), we must begin by recognizing the firmly established principle that the issue of manageability of a proposed class

action is always a matter of "justifiable and serious" concern for the trial court and peculiarly within its discretion. This is so because the issue is one of fact, subject to determination by the district court; it is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise than does a court of appeals. Consequently, it is an area in which the trial court must of necessity be granted a wide range of discretion." And this is particularly true in actions governed by Rule 23(b)(3). (citations omitted).

It is the opinion of this Court that the plaintiff has failed to sustain her burden of proof in establishing either the predominance of common questions of law and fact or the superiority of the class as a method of adjudicating the relevant issues. For these reasons the plaintiff's request for class certification must be and the same is hereby denied.

AND IT IS SO ORDERED.