IN THE MATTER OF THE CADILLAC V8–6–4 CLASS ACTION.

Argued December 7, 1982—Decided June 7, 1983.

414

416

417

*David M. McCann* and *Patrick F. McCartan,* a member of the Ohio bar, argued the cause for appellant Cadillac Motor Car Division of General Motors Corporation (*Carpenter, Bennett & Morrissey,* attorneys; *Laurence Reich* and *Rosemary A. Hall,* on the brief).

*Adrian I. Karp* and *Guy W. Haskins* argued the cause for respondents Adrian I. Karp, P.A., Philip R. Abbate, Future Tire, Inc., John Cotaskos, Joseph Bertolino and Seymour Krupat on behalf of themselves and others similarly situated (*Haskins, Hack, Piro & O'Day* and *Adrian I. Karp,* attorneys; *Adrian I. Karp,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is whether this Court should reverse the certification of a state-wide class of approximately 7,500 purchasers of 1981 Cadillac automobiles with V8–6–4 engines. This matter involves six consolidated actions in which Adrian I. Karp, P.A. (Karp, P.A.), a professional corporation through which Adrian Karp (Karp) practices law, appears as co-counsel for all plaintiffs. Karp, P.A. also appears as a representative class member. Plaintiffs claim that the 1981 Cadillacs contained common design defects and that defendant, Cadillac Motor Car Division of General Motors Corporation (GM), knowing of these defects, defrauded them and other consumers into purchasing the cars.

GM urges decertification, contending that common questions of law or fact do not predominate over considerations affecting only individual members and that a class action is not superior to other available methods for a fair and efficient adjudication.

GM also challenges the dual roles of Karp, P.A. as representative class member and counsel for the class.

After excluding claims for personal injuries and emótional distress of passengers and drivers other than owners, the trial court certified a class of all persons who resided in the State as of January 29, 1981, who either owned formerly or at present own a "1981 V8–6–4 equipped Cadillac." Furthermore, the trial court permitted Karp, P.A. to continue as a class representative and counsel. The Appellate Division denied GM's motion for leave to appeal. However, we granted leave to appeal. 91 *N.J.* 235 (1982). Subject to certain modifications, we now affirm the order certifying the class and remand the matter to the trial court.

We conclude further that Karp, P.A. may not serve as both class representative and attorney for the class. On remand, Karp must advise the trial court in which capacity he wishes to serve. Because an attorney should not undertake to act as counsel in a matter in which he expects his testimony to be essential, if Karp elects to continue as counsel, he must dismiss his individual claim and he may not testify at trial.

## I

The maintainability of a class action should be determined as soon as practicable after the commencement of the action. *R.* 4:32–2(a). At that early stage, many crucial questions remain not only unresolved but unexplored. In the present proceeding, nonetheless, certain facts are undisputed and some critical factual issues are identifiable.

On December 3, 1980, Karp, P.A. bought from Vey Cadillac of Rockaway (Vey) for $25,386 a 1981 Cadillac Seville made by GM and equipped with a V8–6–4 engine. By January 12, 1981, Karp twice had taken the car to Vey for servicing. On that date, he complained of a burning smell after use, the flashing of warning lights on the dashboard and of the engine dying at high speeds, only to "kick back in." Vey was unable to correct the complaints, which it claimed did not appear during road testing, but

did replace the gas filter. Four days later, the car stalled and was towed back to Vey. At this time, Vey diagnosed the burning smell as the result of a leaking oil sending switch, which was repaired. The day after it was returned to Karp, the car again stalled and was again towed back to Vey, where it started immediately on arrival. Karp asked that the car not be repaired or returned, but stated that he wanted to rescind the contract of sale.

On the same date, January 22, 1981, Karp wrote a letter to the New York office of GM demanding a rescission of the sale. The next day Karp wrote to Vey alleging that Vey was unable to repair the vehicle and stating that he wanted to return the car, convey title, and receive a refund. Two days later, Karp traded in the Cadillac and purchased a Jaguar for $26,500. In a letter to GM, he demanded damages of $7,042.45, reflecting the cost of the Cadillac less its trade-in value, plus $156.45 for rental of a substitute car. Accusing the manufacturer of placing an inherently dangerous engine into the stream of commerce, Karp threatened, if not paid within two weeks, to bring both individual and class actions.

Although GM suggested that the matter be referred to arbitration, Karp, P.A. filed a complaint against GM and Vey on behalf of itself and those similarly situated, demanding rescission, compensatory damages, punitive damages, injunctive relief, and costs. Alleging that the V8–6–4 engine was defective, Karp, P.A. predicated liability on various legal theories: negligence, strict liability, breach of express and implied warranties, violations of the *Magnuson-Moss Warranty Act*, 15 *U.S.C.* § 2301 *et seq.*, fraud, and misrepresentation. Subsequently, Karp, P.A. filed as co-counsel five similar class action complaints on behalf of other representative owners in New Jersey.

At the core of the dispute is the V8–6–4 engine, which was designed to maximize efficiency by allowing an eight cylinder engine to run on eight, six or four cylinders, depending on the need for power at any particular time. The number of cylinders operating is regulated by a small computer inside the engine.

Installed in Cadillacs for the 1981 model year only (except limousines), the engine was intended to meet federal fuel efficiency requirements.[1]

Purchasers of automobiles containing the V8-6-4 engine received identical express warranties and service contracts, including an extension of warranty issued on July 20, 1981, which covered the engine for five years or 50,000 miles. Furthermore, plaintiffs point to a Dealer Service Information Bulletin distributed to dealers on November 5, 1980, but not to the general public. The bulletin describes as "characteristics of the automobile, a slight lag in vehicle response, slight speed changes and a slight sensation when the engine runs in the six cylinder mode." In its conclusion, the bulletin instructs dealers not to schedule repairs for the listed conditions.

The characteristics described in the bulletin correspond to the common complaints of the owners, which include engine stalling, engine hesitation, engine failure, engine surge, rough ride, and a burning odor, sometimes accompanied by fire. Plaintiffs allege that GM marketed the engine knowing of its defects and issued warranties knowing that it could not honor them and repair the vehicles. Karp garnered these complaints about the car from answers to questionnaires mailed nationwide to potential class members who, he says, first communicated with him after learning of the lawsuit in the press.

At this time, plaintiffs cannot identify the precise design defects that caused these complaints. They suspect, however, that the cause is a defective part of the engine computer called a "PROM", and they intend to pursue that theory through discovery and expert testimony.

GM vigorously contends that the engine is not defective and that diverse causes unrelated to the design of the V8-6-4 engine

---

[1]The gas guzzler tax, 26 *U.S.C.* § 4064, imposed a tax on 1981 automobiles whose fuel economy (average miles per gallon) was less than 17 miles per gallon. The amount of tax ranged from $200 to $650 per vehicle depending on the actual fuel economy of the model type.

are the source of the common complaints. For example, it attributes the various problems of the individual owners to defective parts, improper maintenance, alteration of the car, or intervening accidents. GM asserts that the need to prove these numerous causes of engine failure would necessitate thousands of mini-trials involving, among others, the issues of causation and damages as to each car owner. Thus, GM contends that certification would prevent it from pursuing defenses based on each car's individual characteristics and use by each owner.

After limited discovery and oral argument on four separate days, the trial court consolidated the six cases and granted plaintiffs' motion for class certification. Limiting the class to New Jersey residents who either formerly or as of the date of its opinion owned Cadillacs with V8–6–4 engines, the trial court certified the action as to claims based on breach of express and implied warranties, negligence, strict liability, fraud, misrepresentation, violation of the *Magnuson-Moss Warranty Act,* and refusal to accept recission. Because the *Magnuson-Moss Warranty Act* requires notification and an opportunity to cure, the court created a subclass of individuals who still owned their automobiles, and ordered that the action with respect to that Act not proceed further unless class members, through their attorneys, meet the statutory requirements and afford GM an opportunity to cure the defect.

The court ordered that all potential class members be notified at the expense of the plaintiffs and that class members be given the opportunity to be excluded from the action. *See R.* 4:32–2(b). Furthermore, the court denied GM's motion to disqualify Karp from serving as both counsel and class representative. Finally, the court dismissed with prejudice the complaint against Vey.

## II

Class actions originally developed in equity as a means of consolidating numerous claims involving common issues in a

single action. 3B *Moore's Federal Practice* § 23.02[1] (1982); 7 Wright & Miller, *Federal Practice and Procedure* § 1751 (1972). As time passed, certification of a class became a means of maintaining an otherwise uneconomical action. By permitting claimants to band together, class actions equalize adversaries and provide a procedure to remedy a wrong that might otherwise go unredressed. If successful, a class action can produce a substantial fund to compensate the class members for their damages and their attorney for his services. One potential abuse of the class action is that attorneys may solicit claims more to generate fees for themselves than to vindicate the rights of claimants. *Moore's Federal Practice* ¶ 23.02[1] (1982). Because a class action allows a few representatives to litigate the rights of many, a court must be cognizant of the rights of absent class members.

To qualify as a class action, a lawsuit must meet the requirements of *R.* 4:32–1,[2] which is modeled after Rule 23(a) and (b) of

---

[2]The text of *R.* 4:32–1 is as follows:

4:32–1. Requirements for Maintaining Class Action

(a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk either of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunc-

the *Federal Rules of Civil Procedure.* Initially, *R.* 4:32–1(a) imposes four requirements for certification: numerosity, commonality, typicality, and adequacy of representation.

▋ In this case, the trial court found that the action . readily satisfied these four requirements. We agree. A class of approximately 7,500 plaintiffs is sufficiently numerous so that joinder is not a satisfactory alternative. *R.* 4:32–1(a)(1). Common questions of law and fact arise from allegations of a design defect in the V8–6–4 engine, GM's knowledge of that defect, and the terms of the express warranty issued by GM. *See R.* 4:32–1(a)(2). The requirement that the claims of the representative parties be typical of the class, *R.* 4:32–1(a)(3), is sometimes equated with the requirement of *R.* 4:32–1(a)(4) that the representative parties fairly and adequately protect the interests of the class. 3B *Moore's Federal Practice* ¶ 23.06–2 (1982). The claims of the representatives must "have the essential characteristics common to the claims of the class." *Id.* All plaintiffs claim that through GM's misrepresentation they bought defective automobiles and that they have suffered the same breach of the same warranty. We are satisfied that the claims of the representatives are typical and that the representatives will adequately protect the interests of the class.

▋ More difficult is the question whether the action satisfies any of the three alternative requirements of *R.* 4:32–1(b). Only

---

tive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.

one of those requirements, that pertaining to actions seeking damages based on a common or related sequence of events, *R.* 4:32–1(b)(3), is relevant to this case. This question has two parts: (1) whether plaintiffs have met the burden of proving that common questions of law and fact predominate over individual claims and (2) whether a class action is superior to other methods of adjudication. *See R.* 4:32–1(b)(3). In answering those questions, we recognize that a determination of the maintainability of a class action should be made as soon as practicable after the commencement of an action. *R.* 4:32–2(a).

Implicit in the determinations of predominance and superiority is an identification of the relevant factual and legal issues. The mere identification of those issues, however, is less penetrating than their subsequent evaluation on a motion for summary judgment or at trial. Certification of a class action should not be denied because of the underlying theory on which the action is predicated. *Olive v. Graceland Sales Corp.,* 61 *N.J.* 182, 189 (1974). Nonetheless, even the identification of the issues to determine the suitability of an action for certification requires some preliminary analysis. *See* Miller, *An Overview of Federal Class Actions: Past, Present and Future* 51 (1977).

With respect to the cause of action predicated on strict liability, plaintiffs must prove ultimately that GM placed in the stream of commerce a defectively designed product and that the defect caused damage to the class members. *Michalko v. Cooke Color & Chemical Corp.,* 91 *N.J.* 386, 394 (1982); *Scanlon v. General Motors Corp.,* 65 *N.J.* 582, 590 (1974). In this regard, plaintiffs claim that the Cadillacs did not work because of a common design defect, which manifested itself in malfunctionings such as engine failure, stalling, hesitation, and surge. Although they are not sure of the underlying cause of the malfunction, at oral argument plaintiffs attributed it to the PROM component in the V8–6–4 engine computer.

Karp further advised us at oral argument that plaintiffs had retained an expert who, he anticipated, would identify the

specific defect or defects in the engine. In light of that representation and their contention that the engine computer is the cause of the problem, we believe that plaintiffs have identified the defect with sufficient specificity. In the future, however, where plaintiffs seek certification of a class in a products liability action, they should identify the defect with greater specificity in affidavits or other proofs supporting the motion for certification.

■ In addition to alleging a common defect, plaintiffs must also allege that the defect caused damage. Insofar as damages are concerned, we have allowed previously a claim for loss-of-the-bargain against a manufacturer who placed a defective product in the stream of commerce. *Herbstman v. Eastman Kodak Co.*, 68 *N.J.* 1, 11 (1975); *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 152 (1973); *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 64–65 (1965); see *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169–70 (1979). Consequently, we find that the allegation of damages is sufficient.

From plaintiffs' perspective, the issue of causation will require extensive discovery and expert testimony, the cost of which would be intolerable for individual car owners in a myriad of independent actions. From GM's viewpoint, the issue of causation, like the issue of damages, is hopelessly fragmented and can be resolved only by individual proceedings. GM contends that the complaints of individual owners may be attributable to such divergent causes as improper maintenance, unauthorized alterations, and accidents.

■ The same proof that establishes a defect in strict liability may also establish that a product is not fit and suitable for the purpose intended and, therefore, constitutes a breach of an implied warranty of fitness and merchantability. As with their claims predicated on strict liability, plaintiffs rely on the engine failure to establish a breach of the implied warranty of fitness and merchantability. Proof of engine failure may be sufficient to establish an individual cause of action for breach of

implied warranty, but the mere proof of common complaints in some engines may be insufficient to establish that all identical engines will manifest the same complaints. For the purpose of certifying this class action, we need not assume from mere proof of the failure of some either that all V8–6–4 engines have failed or that those that have failed have done so for the same reason. Through expert testimony, plaintiffs expect to prove that the PROM or some other specific defect is the cause of the engine failure. Even if the class members cannot prove a specific defect, their common complaints (*e.g.*, stalling, engine hesitation, failure, and surge) might sustain a class action for breach of implied warranty if the complaints correspond to the anticipated engine "characteristics" described in the Dealer Service Information Bulletin (*e.g.*, speed changes and lag in vehicle response).

We turn now to the expanded express warranty sent to Cadillac owners on July 20, 1981. That warranty apparently supplemented the original new vehicle warranty and provided that GM "will make any repairs or needed adjustments on any of the parts listed below of a V8–6–4 engine installed in a Cadillac made necessary because of defects in material or workmanship for five years or 50,000 miles, whichever occurs first." The warranty applies to subsequent, as well as original, owners. It provides "warranty repairs will be performed at no charge to the owner by a Cadillac dealer at its place of business. A reasonable time must be allowed after taking the car to the dealer." As a condition precedent to the dealer's obligation, then, the car owner apparently is obliged to permit the dealer to repair the vehicle. Whether the expanded warranty was actually breached, therefore, depends not only on the automobile's failure to perform, but also on the manufacturer's failure to meet its obligation to repair. Because Karp, P.A. had sold its Seville by the date the warranty was issued, a question arises whether it can properly act as class representative on the express warranty claim. These issues were not briefed or argued before us, and we leave it to the trial court on remand to decide whether to decertify the class action based on express

warranty, modify the certification, or take such other action as it deems appropriate.

As a condition precedent to an action under the *Magnuson-Moss Warranty Act,* 15 *U.S.C.* §§ 2301–2312, consumers must provide an automobile dealer with an opportunity to cure the defect. 15 *U.S.C.* § 2310(e). The Act, which gives consumers a federal cause of action for breach of express and implied warranty, allows for the award of damages, costs (including attorneys' fees), and other legal and equitable relief. 15 *U.S.C.* § 2310(d); *see Ventura v. Ford Motor Corp.,* 180 *N.J.Super.* 45, 59–63 (App.Div.1981). To meet this requirement, the trial court ordered class representatives still owning their vehicles to notify GM of the alleged defects and provide an opportunity to cure. Only to the extent that GM refuses or fails to comply may an action be maintained under the Act.

With respect to the allegations of fraud and misrepresentation, plaintiffs ultimately must establish that, with knowledge of its falsity, GM misrepresented a fact with the intent that plaintiffs rely on the misrepresentation and that plaintiffs so relied and were damaged. *Towpath Unity Tenants Ass'n v. Barba,* 182 *N.J.Super.* 77, 83 (App.Div.1981). The primary allegation of fraud is that GM knew the V8–6–4 engine was defective when it placed it in the stream of commerce. Knowledge of the defect is reflected, plaintiffs contend, in the November 5, 1980 Dealer Service Information Bulletin, which designates as "characteristics of the automobile" the conditions that plaintiffs describe as defects. The bulletin, which was not provided to purchasers, advises dealers not to schedule repairs for those conditions. In short, plaintiffs contend that GM, with knowledge that they could not be repaired, placed in the stream of commerce engines that hesitated, stalled, surged, and otherwise improperly performed. Individual hearings may be required on such matters as damages and reliance of the individual class members on the misrepresentation. That possibility,

however, must be weighed against the common allegations of fraud by GM.

A second allegation of fraud arises from the fact that GM marketed 1981 Cadillacs without advising consumers that the V8–6–4 engine would not be installed in models for subsequent years. Plaintiffs claim, in effect, that if they had known that the V8–6–4 engine was intended as a one-year experiment, they would not have bought Cadillacs costing approximately $25,000 each. Once again, we need not evaluate in detail the sufficiency of the proofs. *See Olive v. Graceland Sales Corp., supra.*

Insofar as negligence is concerned, the complaint asserts that GM was negligent in failing to warn consumers that the V8–6–4 engine was insufficiently tested, in failing to recall all cars containing the engine, and in marketing the allegedly defective car. Under the circumstances here, those allegations are sufficient to pass muster.

Although plaintiffs' causes of action embrace common legal and factual elements, the critical question remains whether the benefit from the determination in a class action of the existence of a common defect and a common pattern of fraud outweighs the problems of individual actions involving such other issues as causation, reliance, and damages.

### III

In addressing that question, the ultimate considerations are whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," *R.* 4:32–1(b)(3), and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* A conclusion on the issue of predominance requires an evaluation of the legal issues and the proof needed to establish them. As a matter of efficient judicial administration, the goal is to save time and money for the parties and the public and to promote consistent decisions for people with similar claims. *Fed.R.Civ.P.* 23 Adviso-

ry Committee Note, 39 *F.R.D.* 98, 102–03 (1966). Sometimes the common questions may not warrant certification of a matter as a class action, but in other cases they will be sufficient to sustain a class action even if they do not dispose of the entire matter. 7A Wright & Miller, *Federal Practice & Procedure* § 1778 at 54 (1972). If a "common nucleus of operative facts" is present, predominance may be found. *Id.* at 53. From another perspective, the basic question is whether the potential class, including absent members, seeks "to remedy a common legal grievance." 3B *Moore's Federal Practice* ¶ 23.45[2] at 23–332 (1982).

This case presents at least the following common issues of law or fact: (1) the existence of a design defect in the V8–6–4 engine at the time GM placed the Cadillacs in the stream of commerce; (2) the existence of implied warranties of fitness and merchantability; (3) the characteristics of a merchantable Cadillac Seville; (4) breach of the implied warranties of fitness and merchantability because of a common engine defect; (5) the issuance of an identical express warranty to all class members; (6) partial breach of the express warranty because of a common defect; and (7) misrepresentation by GM of the performance characteristics of the V8–6–4 engine and of its intention to continue that engine in future years.

Remaining as individual issues are: (1) proof that the design defect caused the claimed damage; (2) failure by GM to cure the defect; (3) actual reliance by class members of the misrepresentation of GM; and (4) damages of each class member.

Cases decided in other contexts are of limited help in determining whether common issues predominate in a given case. Furthermore, different courts, even when presented with substantially similar, if not identical, claims have reached divergent conclusions in deciding whether to certify a class action. *Compare Payton v. Abbott Labs,* 83 *F.R.D.* 382 (D.Mass.1979) (certifying statewide plaintiffs' class of all women exposed to DES in utero), *with McElhaney v. Eli Lilly & Co.,* 93 *F.R.D.* 875 (D.S.D.1982), and *Ryan v. Eli Lilly & Co.,* 84 *F.R.D.* 230 (D.S.C.

1979) (refusing to certify similar class actions in part because of individualized proofs required on damages and causation).

Many courts in cases involving common disasters have certified class actions even though individual issues will remain after adjudication of other issues on a class basis. *See, e.g., In re Skywalk Cases,* 93 *F.R.D.* 415 (W.D.Mo.), vacated on other grounds, 680 *F.2d* 1175 (7th Cir.1982) (certifying a class action resulting from collapse of hotel skywalks); *In re Three Mile Island Litigation,* 87 *F.R.D.* 433, 440 (M.D.Pa.1980) (certifying class of individuals claiming injury from nuclear plant accident); *American Trading and Production Corp. v. Fischbach & Moore, Inc.,* 47 *F.R.D.* 155, 157 (N.D.Ill.1969) (certifying class of exhibitors whose property was destroyed at convention fire).

More relevant are those cases certifying a class action notwithstanding the presence of individual issues apart from damages. *See, e.g., In re Agent Orange,* 506 *F.Supp.* 762, 790 (E.D.N.Y.), rev'd in part for lack of federal question jurisdiction, 635 *F.2d* 987 (2d Cir.1980), *cert. den.,* 454 *U.S.* 1128, 102 *S.Ct.* 980, 71 *L.Ed.2d* 116 (1981) (holding certifiable class of Vietnam veterans and their families suing companies that manufactured chemical claimed to cause serious physical injury); *Payton v. Abbott Labs, supra* (certifying class of women exposed in utero to DES); *Sanchez v. Lowell Lebermann, Inc.,* 79 *F.R.D.* 21, 24 (W.D.Tex.1978) (allowing class action under Truth-in-Lending Act despite requirement that plaintiffs each prove that product was purchased for personal, family or household use); *Herrmann v. Atlantic Richfield Co.,* 65 *F.R.D.* 585, 592–93 (W.D.Pa. 1974) (certifying antitrust class action despite necessity of complicated proofs of impact on individual plaintiffs); *Vasquez v. Superior Court of San Joaquin Cty.,* 4 *Cal.3d* 800, 94 *Cal.Rptr.* 796, 484 *P.2d* 964 (1971) (allowing class action for recission of installment contracts based on seller's fraudulent misrepresentation); *Lucas v. Pioneer, Inc.,* 256 *N.W.2d* 167 (Iowa 1977) (certifying class action brought by farmers against seed companies alleging that crop loss was caused by defective seed); *Newman v. Tualatin Development Co., Inc.,* 287 *Or.* 47, 597 *P.2d*

800 (1979) (certifying class action of townhouse owners against builder, where claims involved allegations that water pipes were deteriorating in entire development). *But see, e.g., In re Northern Dist. of Calif. "Dalkon Shield" IUD Products Liability Litigation,* 693 *F.2d* 847 (9th Cir.1982) (decertifying class of plaintiffs for failure to meet typicality and superiority requirements); *Feinstein v. Firestone Tire & Rubber Co.,* 535 *F.Supp.* 595 (S.D.N.Y.1982) (declining to certify class of millions of tire purchasers where it appeared that most tires claimed to be defective actually performed normally); *Ryan v. Eli Little & Co., supra,* and *McElhaney v. Eli Little & Co., supra* (refusing to certify plaintiffs' class action against drug manufacturer in part because of individualized proofs required on causation and damages); *Rosenfeld v. A.H. Robins Co., Inc.,* 63 *A.D.2d* 11, 407 *N.Y.S.2d* 196, 201 (1978) (holding that individual proofs required to prove fraud against IUD manufacturer requires conclusion that individual issues predominate).

Courts have reached divergent results in determining whether to certify class actions in cases involving allegedly defective automobiles. In *Lieb v. American Motors Corp.,* 95 *F.R.D.* 507 (S.D.N.Y.1982), the court declined to certify as a class jeep owners who claimed that American Motors committed fraud by not warning them that the car might roll over during normal use. The complaint sought certification of a class of the owners of approximately 250,000 jeeps that had been sold over a period of five years, during which the models changed substantially. Advertising, including printed material pertaining to the safety of the vehicle, varied from year to year. The class representative, who had purchased his car in another state, was typical of only a small portion of the class. Finally, the court noted that the suit sought recovery of economic loss in a strict liability action, a claim that was questionable under New York law.

Similar problems plagued plaintiff's case in *Gilmore v. General Motors Corp.,* 35 *Ohio Misc.* 36, 300 *N.E.2d* 259 (Com.Pl.1973), which involved hundreds of thousands of present and former owners of allegedly defective Corvairs, covering nine model

years. In denying class certification, the court pointed out that even such issues as coverage under warranty and applicability of the statute of limitations would differ significantly from plaintiff to plaintiff. Moreover, since not all class members could be presumed to have purchased their Corvairs in Ohio, the laws of a number of different states would have to be applied to the breach of warranty claims. By contrast, the present class action is restricted to a class of owners in a single state and involves an engine for a single model year in a state that allows an action for economic loss in a products liability case. *See Santor v. A & M Karagheusian, Inc., supra,* 44 *N.J.* at 64–65.

In *Landesman v. General Motors Corp.,* 42 *Ill.App.*3d 363, 1 *Ill.Dec.* 105, 356 *N.E.*2d 105 (1976), the Appellate Court of Illinois reversed the dismissal of the class action complaint seeking the replacement value of engine mounts for five model years of Chevrolet automobiles. The court found that minor variations in the claims should not defeat a class action where the dominant issue was the propriety of payment. 1 *Ill.Dec.* at 107, 356 *N.E.*2d at 107. Four years earlier, however, a different part of the same court had declined to certify a class action of four million owners of Ford and Mercury automobiles for five model years. *Reardon v. Ford Motor Co.,* 7 *Ill.App.*3d 338, 287 *N.E.*2d 519 (1972). Relying on Illinois common-law principles, the court noted that the members did not share the "community of interest" required for class certification.

An appellate court also reversed the denial of certification in *Anthony v. General Motors Corp.,* 33 *Cal.App.*3d 699, 109 *Cal. Rptr.* 254 (1973). There, plaintiffs sought replacement, at GM's expense, of allegedly defective disc wheels in 1960–1965 model trucks. Noting proof of that allegation would require a lengthy trial, the court concluded: "It is exactly the sort of common issue for which class actions are designed." 109 *Cal.Rptr.* at 257.

In the present case, the answer to the issue of predominance is found more readily in a close analysis of the facts and law than by recourse to reported decisions. Each of the plain-

tiffs' claims addresses the existence and nature of the defect in the V8–6–4 engine and GM's knowledge and intent in selling the Cadillacs. *See Payton v. Abbott Labs, supra,* 83 *F.R.D.* at 391–92. Here, the trial court found that the core of the case concerns common issues of fact and law and that, notwithstanding the individual proofs required on their respective claims, plaintiffs seek to redress a "common legal grievance."

## IV

The last prerequisite for certification is that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." *R.* 4:32–1(b)(3). In assessing that requirement, we are mindful that the class action rule should be construed liberally in a case involving allegations of consumer fraud. *Riley v. New Rapids Carpet Center,* 61 *N.J.* 218, 228 (1972) (in a consumer fraud case, "a court should be slow to hold that a suit may not proceed as a class action"); *Lusky v. Capasso Bros.,* 118 *N.J.Super.* 369, 373 (App.Div.1972) (calling for liberal construction of class action rule in breach of license agreement case).

One frequent characteristic of a consumer class action is that the individual claims involve too small an amount to warrant recourse to litigation. Thus, the wrongs would go without redress, and the manufacturer may continue with impunity to place defective products on the market. *See Riley v. New Rapids Carpet Center, supra,* at 225; *Kugler v. Romain,* 58 *N.J.* 522, 539–40 (1971). A consequence of certification of a class action is the equalization of the ability of the parties to prepare and pay for the advocacy of their rights. Furthermore, certification can aid the efficient administration of justice by avoiding the expense, in both time and money, of relitigating similar claims.

In the final analysis, a class action should be viewed not only as a procedural device that enables plaintiffs with small claims to band together against a common adversary, but also as

a means of providing a procedure that is fair to all parties and promotes judicial efficiency. The relevant considerations include, therefore, not only the interests of class members and other parties but also the effect of class certification on efficient judicial management. R. 4:32–1(b)(3).

By definition, "superior" implies a comparison with alternative procedures such as a test case or joinder of claims. *Katz v. Carte Blanche Corp.,* 496 *F.*2d 747 (3d Cir.1974). That comparison requires: "(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method." *Id.* at 757.

*Katz* involved an action under the Truth-in-Lending Act for failure to disclose computation of financial charges brought on behalf of almost a million credit card holders. Carte Blanche contended that it would be irreparably damaged if class members were notified of the pendency of a class action, because it would be obliged to file compulsory counterclaims, a procedure that would interrupt the normal collection of payments. A majority of the court agreed and required that class certification be held in abeyance until the completion of a test case of the defendant's liability. The court emphasized the possibility of applying collateral estoppel for the benefit of other cardholders if Carte Blanche should be found liable in a test case. *Accord Fitzgerald v. Northeastern Hospital of Philadelphia,* 418 *F.Supp.* 1041 (E.D.Pa.1976) (also involving the Truth-in-Lending Act). The Appellate Division reached a similar result in *Kronisch v. Howard Savings Inst.,* 143 *N.J.Super.* 423 (1976), which involved an action by a class of mortgagors against a class of mortgagees alleging a common practice of misuse of tax escrow funds.

Applying the three factors enumerated in *Katz,* we conclude that the trial court did not abuse its discretion in holding that a class action is preferable to a test case. *See*

*Bogus v. American Speech & Hearing Ass'n,* 582 *F.*2d 277 (3d Cir.1978). Many of the crucial issues are factual and raise substantial problems of proof—*e.g.,* the existence of a design defect, GM's knowledge of the defect, and its intent toward its customers. Those proofs doubtless will require substantial discovery, expert testimony, and trial time, all of which would render uneconomical an individual suit by a single disgruntled customer. As one treatise states: "[I]ndividual actions or a test case may be an inferior alternative to the class action when the economics of the situation make it impossible for the aggrieved members to vindicate their rights by separate actions." 7A Wright, Miller & Kane, *Federal Practice & Procedure* § 1778 (Supp.1983). *See Riley, supra,* 61 *N.J.* at 225. In a case in which the proofs regarding the defendant's conduct will be identical whether or not a class action is certified, and the maintenance of a test case may be prohibitively expensive for an individual consumer, the class action emerges as the superior method of adjudication. *See Werfel v. Kramarsky,* 61 *F.R.D.* 674 (S.D.N.Y.1974) (holding class action superior where individual claims do not warrant separate suits). By contrast, the common issues in *Katz* and *Kronisch* were more legal than factual—*i.e.,* whether, given the defendants' conduct in both cases, liability should be imposed. As previously noted, joinder is not feasible because approximately 7,500 claimants are too many to join in a single action.

Moreover, *R.* 4:32 vests in the trial court substantial control over management of a class action. A trial court can mold the class, as the trial court has done here, and, in an appropriate case, can even decertify a class. *See In re Sugar Industry Anti-Trust Litigation,* 73 *F.R.D.* 322, 358 (E.D.Pa.1976).

We reject GM's contention that certification of a class action would violate its right to due process of law under the Fourteenth Amendment by preventing it from asserting individual defenses, such as the treatment of the vehicles by each plaintiff and actual reliance on GM's representations.

That assertion misconstrues the nature of class action proceedings. Certification as a class action does not limit a defendant's right to pursue any defense on any of a plaintiff's claims. In the present case, for example, certification merely permits litigation of common issues on a class basis before litigation of individual issues. Accordingly, we reject the dictum in *Gilmore v. General Motors Corp., supra,* 300 *N.E.2d* at 264, which suggests due process problems inhere in the certification of a class action where individual issues remain for subsequent litigation.

Similarly, we reject the contention that certification should be denied because of the possibility of ensuing problems for GM in its customer relations. Underlying that contention is GM's fear that it will be irreparably injured if notice of the class action is provided to the more than 7,500 class members, some of whom allegedly suffered no damage. Doubtless, GM's reputation would be in better standing if the present action did not exist, but that consideration cannot be dispositive if plaintiffs allege a meritorious cause of action. Although GM is a major automobile manufacturer, its vehicles, like those of other manufacturers, are recalled occasionally to correct defects. As a corollary of mass-production, the public no longer expects perfect products, and the mere filing of a class suit will not be the deathknell of GM. In another context, the possibility of prejudice to a defendant may be so severe as to render a class action inferior to other methods of litigation. *See Katz v. Carte Blanche Corp., supra.* The facts of this case, however, do not warrant that finding.

To conclude, the trial court determined that the benefit from the determination in a class action of such issues as a common defect, breach of warranty, and intentional misrepresentation outweighs the problems of litigating separately individual issues such as reliance, causation, and damages. Implicit in that decision is a conclusion by the trial court that a class action is the most efficient means of managing a matter involving numerous claimants spread throughout the state. GM has not

undertaken to establish that any alternative procedure would be better, and we cannot say that the trial court committed an abuse of discretion in certifying the matter as a class action. Consequently, we affirm the trial court's finding that common questions of fact and law predominate and that the class action is the superior method of adjudication.

V

The remaining problem arises from Karp's multiple roles as class member, representative, and counsel. Our analysis of that problem begins with the recognition that lawyers are obligated to avoid even the appearance of impropriety. DR9-101. The most serious concern arises from the potential conflict in Karp's serving in the dual capacities as class representative and counsel.

Although conflicts between the two roles might arise in various ways, one potential conflict inheres in the compensation of counsel in a class action. If the class action is unsuccessful, neither the class members nor Karp will be compensated. If, however, the action should succeed, it will result in the payment, either by settlement or judgment, of a fund in court. Any fee Karp might receive as attorney would be paid, subject to the approval of the Court, from that fund. Notwithstanding the ultimate responsibility of the court to approve a request for fees, a class representative has some obligation to oversee the conduct of counsel, including the request for fees. The potential conflict between the class representative and counsel with respect to fees is apparent.

In resolving this conflict, the United States Court of Appeals for the Third Circuit has adopted a per se rule prohibiting a lawyer from serving in the dual capacities of class representative and attorney of record. *Kramer v. Scientific Control Corp.,* 534 *F.*2d 1085, 1090 (1976); *see Turoff v. May Co.,* 531 *F.* 2d 1357 (6th Cir.1976). Even those courts that have not adopted a per se prohibition recognize that the dual relationship not only creates the appearance of impropriety, but also impairs the

ability of the representative to protect adequately the interests of the class. *See, e.g., Susman v. Lincoln American Corp.,* 561 *F.* 2d 86 (7th Cir.1977); *Brick v. CPC Intern. Inc.,* 547 *F.*2d 185 (2d Cir.1976). In general, we agree that the better rule favors a per se prohibition against a single attorney serving as both class representative and counsel. That result avoids the appearance of impropriety, prevents a potential conflict, and assures protection of the interests of the class. Nonetheless, in some class actions, where the pecuniary incentive is reduced, an attorney might serve as both the counsel and class representative. For example, in certain civil rights, environmental, or other public interest litigation, a worthwhile suit might never be brought unless the class representative could also serve as counsel. In those situations, the conflict between the class representative and counsel is lessened. Here, however, Karp has an identifiable interest in any counsel fees that might be approved by the court. On remand, Karp must advise the trial court whether he wishes to continue as counsel for the class or as a class member and representative.

■ Another ethical problem arises because of the prohibition against a lawyer accepting employment in contemplated or pending litigation if he knows or believes that he will be called as a witness. DR5–101; *see Clark v. Corliss,* 98 *N.J.Super.* 323 (App.Div.1967) (holding that an attorney should not accept employment when it is reasonably likely that his testimony will be required). If Karp were to pursue his individual claim, it is foreseeable that he would be obliged to testify at trial. At oral argument, however, Karp offered to withdraw his individual claim to preserve his status as attorney of record. Furthermore, the trial court decided that the interests of the class would be served best if Karp continued as attorney. If Karp is to continue as counsel for the class, he should not testify in the proceeding. Of course, if Karp elects to forego his role as counsel, then he may continue both as a claimant and as a class representative.

We affirm the order of the trial court as modified and remand the matter to that court for further proceedings.

*For affirmance as modified*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal*—None.